James L. Buchal, OSB No. 921618
E-mail:  jbuchal@mbllp.com
MURPHY & BUCHAL LLP
P.O. Box 86620
Portland, OR  97286
Tel:     503-227-1011

D. Angus Lee, OSB No. 213139
E-mail: Angus@AngusLeeLaw.com
ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA  98665
Tel:     360-635-6464

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOSEPH GIBSON and RUSSELL SCHULTZ,<br><br>                    Plaintiffs,<br><br>               v.<br><br>CITY OF PORTLAND; MULTNOMAH COUNTY; MULTNOMAH COUNTY DISTRICT ATTORNEY'S OFFICE; PORTLAND POLICE BUREAU; TED WHEELER; DANIELLE OUTLAW; JAMI RESCH; CHUCK LOVELL; CHRISTOPHER TRAYNOR; ROD UNDERHILL; MIKE SCHMIDT; BRAD KALBAUGH; and SEAN HUGHEY,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**(42 U.S.C. §§ 1983, 1985 & 1986)**<br><br>**DEMAND FOR JURY TRIAL** |

For their complaint, plaintiffs, JOSEPH GIBSON and RUSSELL SCHULTZ, by and through undersigned counsel, allege as follows:

**Nature of the Action**

1.      This action concerns the abusive misuse of governmental authority to punish political opponents for the exercise of free speech rights, specifically the bringing of baseless charges of "riot" against plaintiffs.

2.      At the same time, governmental authority has been abused to excuse criminal conduct by the criminal gang known as Antifa, including multiple attacks on plaintiffs, and more generally to excuse criminal conduct to the extent that the City of Portland now suffers from rapidly increasing disorder and criminal conduct.

**Parties**

3.      Plaintiff Joseph Gibson is a resident of Clark County, Washington.  At times relevant hereto, he utilized social media to organize public events promoting patriotism, prayer, free speech, and conservative Christian values, utilizing the name "Patriot Prayer".  In the course of such public events, he has publicly condemned Portland-area political leaders for their toleration of Antifa, an association-in-fact of individuals violently opposed to the values promoted by plaintiff Gibson, to the extent that they have regularly appeared at such public events, and violently attempted to "de-platform" Gibson and others.

4.      Plaintiff Russell Schulz is a resident of Clark County, Washington.  At relevant times, plaintiff Schultz attended such public events in alliance with the values promoted by plaintiff Gibson.

5.     As a result of the lawless conduct alleged herein, plaintiffs have been required to severely limit any travel to, or appearance in, the City of Portland.

6.     Defendant City of Portland is a political subdivision of the State of Oregon.

7.     Defendant Multnomah County is a political subdivision of the State of Oregon.

8.     Defendant Multnomah County District Attorney's Office ("MCDA") is a department or division of Multnomah County.

9.     Defendant Portland Police Bureau is a department or division of the City of Portland.

10.     Defendant Ted Wheeler was and is at all relevant times the Mayor of the City of Portland and the Police Commissioner.

11.     Defendant Danielle Outlaw was at relevant times the Chief of Police for the City of Portland.

12.     Defendant Jami Resch was at relevant times the Chief of Police for the City of Portland.

13.     Defendant Chuck Lovell was at relevant times the Chief of Police for the City of Portland.

14.     Defendant Christopher Traynor was at relevant times a Detective with the Portland Police Department.

15.     Defendant Rod Underhill was at relevant times the elected District Attorney for Multnomah County.

16.     Defendant Mike Schmidt was at relevant times and is the elected District Attorney for Multnomah County.  News reporting, which upon information and belief is accurate, states that defendant Schmidt is "old buddies" with an Antifa militant, and that he believes the criminal justice system is built on "white supremacist culture".  As alleged herein, the latter statement should be interpreted to mean that Schmidt and defendants generally seek to abandon the fundamental constitutional principle of equal protection of the laws to allow governmental power they control to punish plaintiffs and other members of their class.

17.     Defendant Brad Kalbaugh was at relevant times and is an attorney working for the Multnomah County District Attorney's office.

18.     Defendant Sean Hughey was at relevant times and is an attorney working for the Multnomah County District Attorney's office.

19.     The above elected District Attorneys were the supervisors of defendants Brad Kalbaugh, and Sean Hughey, and were responsible for their training, supervision, and conduct.  They were also responsible by law for creating policy for the MCDA, and for ensuring that MCDA personnel follow policy and obey the laws of the State of Oregon and of the United States.

20.     At all relevant times, the conduct of defendants pleaded herein was taken under color of state law, in the purported performance of official duties, such that the employers of the individual defendants are liable for their misconduct, and indeed ratified it as alleged herein.

21.     The individual defendants are sued in their individual, personal and official capacities.

**Jurisdiction and Venue**

22.     This Court has jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331(a) and 1343.

23.     This Court has jurisdiction over plaintiffs' pendant state law claim pursuant to 28 U.S.C. § 1367.

24.     Timely notice of plaintiffs' state law claim was delivered to defendants pursuant to ORS 30.275, a true copy of which is attached hereto as Exhibit 1.

25.     Venue is proper in this District and the Portland subdivision of this District pursuant to 28 U.S.C. § 1391 because the events giving rise to these claims occurred almost exclusively in this District and subdivision, and defendants reside, or resided at relevant times, in this District.

**Background and History of Discriminatory Animus**

26.     Defendants are extremely hostile to political and religious beliefs associated with patriotism, the Christian religion, and advocacy for limited government advanced by plaintiffs Schultz and Gibson.

27.     Such beliefs, sometimes identified with the Republican Party, are held by only a very small minority of residents of Portland, on the order of ten percent.  In general, open statement of such views is likely to be met with hostility and intolerance from members of the Portland Community, and defendants have personal and political motives to exercise their governmental authority to discriminate against, repress and violate the fundamental civil rights of this small minority.

28.    At the same time, defendants have exercised political power to protect and foster members of Antifa, a so-called "anti-fascist" association-in-fact of a large number of criminals and Left-wing activists, to repeatedly attack defendants and others.

29.    As set forth below, it has become a custom, practice and policy of the City of Portland and Multnomah County to misuse law enforcement resources to attack members of this small minority, particularly those that have stood up against rising Antifa disorder.

30.    In May 2017, plaintiff Gibson sought and obtained a federal permit for a political event at the Terry Schrunk Plaza in downtown Portland on June 4, 2017.

31.    On or about May 29, 2017, defendant Wheeler issued a public statement declaring that the City of Portland "has NOT and will not issue any permits" for any "alt right events," and said he was "calling on the federal government to IMMEDIATELY REVOKE the permit(s) they have issued for the June 4th event and to not issue a permit for June 10th."

32.    In the May 29th statement, defendant Wheeler also accused Gibson of "bigotry and hatred".  These allegations were false and defamatory.

33.    Wheeler's comments were amplified by Portland media, which widely and falsely accused Gibson of being a "white supremacist," "violent, far-right extremist," and one of the "fascist agitators bring[ing] choreographed terror into our community".

34.    The permit was not revoked, and the June 4, 2017, event was marred by repeated violent attempts by masked and black-clothed Antifa attackers to disrupt it.  Few arrests were made, and upon information and belief, none of the Antifa attackers were held criminally responsible for the June 4th attacks.

35.     In September of 2017, a "Patriot Prayer Free Speech Rally" was held at the Portland Waterfront.

36.     In preparation, the Portland Police Bureau compiled an Incident Action Plan which included a cover page with a photo of Mr. Gibson, center frame, indicating his status as the lead organizer of the protest.

37.     Although four other organizations were referenced in the PPB's Incident Action Plan and had had some communication with PPB, only Mr. Gibson is mentioned by name.

38.     In a July 2018 interview with the Oregonian, defendant Wheeler continued his campaign of defamation, accusing Schultz and Gibson of being "people who come down here [to Portland] and spout their venom."

39.     Upon information and belief, other defendants expressed such views as well.

40.     In August 2018, defendant Wheeler ordered Portland Police not to interfere with Leftist demonstrators camped outside the U.S. Immigration and Customs Enforcement Field Office in Portland for more than five weeks, trapping workers, stopping traffic, and ultimately shutting down the facility for a week.

41.     In or about October 2018, a reporter from the Oregonian wrote an article describing her personal experience attending a rally organized by plaintiff Gibson, reporting "something we need more of:  talk that leads to increasing understanding about opposing thoughts and the people behind them."

42.    Defendant Wheeler publicly attacked the reporter on Twitter, falsely stating that Schultz and Gibson "embrace" "hate, extremism and violence" and stating, in substance, that there could be no "common ground" or understanding with plaintiffs.

43.    Wheeler's agent and political consultant Jake Weigler, as part of a campaign that was, upon information and belief organized, supported or ratified by Wheeler, urged people to sign a petition calling for the reporter, Elizabeth Hovde, to be fired by the Oregonian.  She was.

44.    Multnomah County Chair Deborah Kafoury took the opportunity to attack Mr. Gibson by accusing Ms. Hovde of "[g]iving a voice to people who live only to stoke violence and hate."  Numerous other Portland-area political leaders made similar statements.

45.    On February 6, 2019, the Portland City Council, led by defendant Wheeler, passed a resolution condemning what it characterized as "a rise of white nationalist, white supremacist and alt-right hate groups, many of which have been emboldened by the words and actions of the current presidential administration," and declaring that "the City of Portland will not tolerate hate in any form . . .".

46.    The Resolution was intended to refer and did refer to the group Patriot Prayer led by plaintiff Gibson, which plaintiff Schultz also supported.  A true copy of the Resolution is attached hereto as Exhibit 2.

47.    The resolution constituted a declaration of policy on the part of the City of Portland against allowing the free exercise by plaintiffs of their fundamental constitutional rights of free speech.

48.     The Council, including defendant Wheeler, took this action though plaintiff Gibson appeared before the Council, saying he was "here to denounce all forms of white supremacy and hate," explaining his religious position that the solution to hate was love.

49.     On February 14, 2019, defendant Wheeler publicly and falsely attacked plaintiff Gibson as the "leader of a group that perpetuates hate speech and violence".

50.     That same day, Portland Commissioner Jo Ann Hardesty also publicly and falsely attacked defendant Gibson, utilizing an official website of the City of Portland, claiming that he conducted "hate marches" within the City and, in substance, accusing him of racism and "white supremacy".

51.     The release of that public statement was made in response to attacks on Portland Police Lt. Jeff Niiya, who then commanded the Portland Police Bureau's Rapid Response Team that responded to protests in Portland.  Lt. Niiya maintained extensive communications with protest organizers of all political persuasions, but came under public attack for his communications with plaintiff Gibson.

52.     Both defendant Wheeler and Commissioner Hardesty claimed that Lt. Niiya's communications with plaintiff Gibson, in a fashion that showed equal protection of the laws and proper policy procedure, created "a mandate for specific training to identify and combat white supremacy".

53.     On February 15, 2019, Wheeler publicly announced that he and the Chief of Police, defendant Outlaw, "are going to implement training for the Portland Police Bureau around how to identify white supremacy based on the recommendations of the

Oregon Justice Resource Center, Council on American-Islamic Relations Oregon and the Western States Center."

54.    Wheeler also ordered an "independent investigation to review the existence of bias in the actions of the [Portland Police Bureau] leading up to and during demonstrations involving alt-right and anti-fascist protesters."  Lt. Niiya was removed from the Rapid Response Team.

55.    In substance, public statements by defendant Wheeler, Commissioner Hardesty and other Portland-area political leaders about improving policing to remove bias are coded statements commanding police to exhibit a powerful and unlawful bias against plaintiffs and members of their classes.

56.    The attacks on the Oregon reporter and Lt. Niiya provided a signal to all City and County employees that severe personal consequences would arise for any City or County employee who might be disposed to exercise governmental power in an even-handed fashion with respect to plaintiffs and members of their class.

57.    Over time, the custom, practice, and policy evolved into affirmative efforts to misuse criminal law enforcement resources to target right-wing protestors in Portland, Oregon.

58.    At the same time, the custom and practice evolved so that criminal activity by Antifa and Antifa supporters was excused or ignored by law enforcement.

59.    Antifa and Antifa supporters who threatened and assaulted conservatives were not arrested or prosecuted even with the criminal acts were caught on tape and the perpetrator clearly identifiable.

60.    By March 2019, it was publicly reported that defendant Wheeler had pressured defendant Underhill to arrest and prosecute conservative and right-wing protestors; his office had previously declined to pursue such prosecutions where it was not clear who the initial aggressor was, making it "legally and ethically questionable to file charges".

61.    Upon information and belief, defendants conspired to violate the civil rights of plaintiffs, as policy changed within the MCDA to formally excuse Antifa attackers on plaintiffs and others of their claims, while prosecuting plaintiffs and others of their class whether or not objective review of the charging circumstances supported criminal charges.

62.    On May 1, 2019, Gibson and Schultz appeared outside a Portland cider bar, known as Cider Riot, which in substance operated as a headquarters for Antifa within the City of Portland.  They damaged no property, threw nothing, and committed no assaults.  Their appearance was during daylight hours and lasted about half an hour.

63.    Upon information and belief, defendants already knew, from the Portland Police Bureau, that Cider Riot was a meeting place for Antifa members engaged in ongoing vandalism and criminal activities, but had undertaken no meaningful investigative activities at the location, in accord with the pro-Antifa policy.

64.    Plaintiffs were among those who saw Antifa as a very serious criminal threat to public disorder in Portland, Oregon, and believed that a serious law enforcement approach was needed.  At this juncture, plaintiffs did not yet appreciate that defendants, though charged to uphold the law in Portland, were, in substance and spirit, on the side of Antifa.

65.    Plaintiff Gibson livestreamed his appearance on Facebook, attempting to call public attention to the nature of the bar and its patrons.  Although repeatedly and violently attacked by the Antifa patrons of the bar, both plaintiffs repeatedly urged others outside the bar not to engage in violence.

66.    Multiple members of the Portland Police Bureau, including at least one plainclothes officer and aerial surveillance, watched all the events at Cider Riot on May 1st, but took no action to halt any of the conduct they observed.  Nor was any riot or unlawful assembly then declared.

67.    Plaintiff Gibson himself broadcast online during the event that Antifa was engaging in a "riot at Cider Riot," and someone should "call the police."

68.    During the protest Gibson wore a t-shirt with a cross on the front symbolizing his Christian Faith.  Below is a picture of Gibson while at the protest in front of Cider Riot.



69.     During the protest Schultz wore a t-shirt with a cross on the front symbolizing his Christian Faith.  Below is a picture of Schultz while at the protest in front of Cider Riot.



70.     On May 2, 2019, defendant Traynor was assigned to investigate the events of May 1, 2019.  Members of the Portland Police Bureau had visited Cider Riot shortly after the events just discussed, and no alleged Antifa victims were willing to talk to them.

71.     Although defendant Traynor did identify at least two victims of criminal conduct by Antifa patrons at the bar, he made no serious effort to identify the perpetrators

on the Antifa side, and no one on the Antifa side was ever arrested or prosecuted for their attacks on Gibson, Schultz, and others—though the identities of at least two such attackers were known to defendant Traynor and others.

72.     Specifically, defendant Traynor obtained video evidence of one individual kicking Gibson and spitting on Gibson.  Despite learning the identity of that individual, and despite Traynor having been notified in writing that Gibson wanted charges pursued against that person, Traynor did not arrest that individual or even bother to request charges be filed by the prosecutor's office.

73.     Instead, defendants conspired to focus investigative resources upon the incident at Cider Riot for the purpose of unconstitutionally targeting plaintiffs on the basis of their political and religious beliefs.

74.     On or about July 8, 2019, defendant Wheeler made further public statements concerning plaintiff Gibson, falsely characterizing him as among a group of people "who have engaged in violence in the streets of this community, [but] they are not in this community".  He also falsely stated that:  "He's [Gibson has] publicly stated in the past that he comes here with others who are often committed publicly to committing acts of violence".

75.     On or about July 8, 2019, Defendant Wheeler also publicly attacked on of the undersigned attorneys for daring to provide legal representation to plaintiff Gibson, who sought nothing more than the enjoyment of his First Amendment rights, thereby furthering the municipal policy that plaintiffs and other members of their class were to be regarded as not entitled to the equal protection of law.

76.    On or about July 16, 2019, defendants became aware of a protest event called "Stand Against Domestic Terrorism," an organizing purpose of which was to bring attention to Antifa as a group that should be classified as a domestic terrorism concern.

77.    As early as August 2, 2019, it was publicly reported that meetings were occurring among the offices of the Mayor, City Attorney, the District Attorney, and others "to help prepare for the Aug. 17 protests".

78.    On August 5, 2019, defendant Outlaw was quoted in the Oregonian concerning the August 17th protest: "Don't come. We don't want you here."

79.    At all relevant times, she and the other two Chiefs of Police during the three years plaintiffs faced criminal prosecution were willing participants in the custom, practice, policy, and conspiracy alleged herein, and made such custom, practice and policy for the Portland Police Bureau.

80.    On August 6, 2019, Wheeler told the Oregonian that he had been meeting with the office of the District Attorney concerning responses to the August 17th protest.

81.    These meetings in early August further developed the conspiracy against plaintiffs and others of their class, and upon information and belief, plans were developed to arrest plaintiffs to prevent the exercise of their First Amendment rights.

82.    Worse still, the conspiracy evolved into a broader campaign of defamation, intended to inflame Antifa members and others into direct physical attacks upon plaintiffs and others of their class for the purpose of destroying their First Amendment rights in the City of Portland and Multnomah County.

83.    Defendant Wheeler announced that on August 14th, he would be "bringing together elected officials, business folks, institution leaders, faith leaders, civil rights

leaders and others" for what became a vicious and false public attack on plaintiffs for their political beliefs.

84.    Referring specifically to plaintiffs (though without naming them), he accused them of "choos[ing] to come to our beautiful, our progressive, our vibrant city to engage in acts of violence and vandalism.  In other words, they are subverting that right to assembly and free speech for the purpose of committing violence."

85.    When an Oregonian reporter questioned Wheeler about a lack of focus on Antifa as the source of violence, Wheeler dismissed the claim as an "unsubstantiated narrative" put forth only by "extreme media sources," confirming his powerful identification with Antifa and its objectives, even to the point of overlooking its infamous history of vandalism and violence.

86.    Focusing his ire on those who sought to deem Antifa a terrorist organization, the Mayor said:  "The people that I'm concerned about on August 17, as I said, they are subverting, in my opinion, these core American values of the right to assembly and the right to free speech to come to our community, to commit acts of violence and vandalism."

87.    While the Mayor claimed that "[v]iolence on our streets is unacceptable regardless of who perpetrates it," subsequent tolerance of mass vandalism and violence by Antifa members, even assaults on police, made it clear that at all relevant times the Mayor has harbored (and acted upon) a powerful animus against plaintiffs and others of their class.

88.    On August 14, 2019, defendant Wheeler led a rally at which he and other

speakers attacked plaintiffs and others, and upon information and belief, multiple other

defendants were in attendance.

89.    A speaker he invited stated that:

". . . fascist white nationalists have sponsored monthly hate rallies in
Portland during the summer since 2017 under the guise of exercising their
free speech and assembly rights. . . .  Creating false equivalencies between
violent white nationalists and those willing to defend our City against their
violence is unacceptable.  Pandering to a national climate that accuses
Portland of being soft on Antifa is unacceptable.  There is no equivalence
between racist, anti-Semitic, Islamophobic, homophobic violence and
those who say no to it.  Antifa must not be scapegoated.  We are in truth a
City that is anti-fascist."

90.    Wheeler also stated:  "So hear me loud and clear.  To those of you who

plan on using Portland on August 17th as a platform to spread your hate, you are not

welcome here."

91.    At all relevant times, defendants have never had any evidence that

plaintiffs Gibson and/or Schultz had engaged in racist violence, anti-Semitic violence,

Islamophobic violence, or homophobic violence.

**The Malicious Prosecution**

92.    Defendants worked together to institute a malicious prosecution of

plaintiffs, with defendants Underhill and Kalbaugh issuing secret indictments

(technically, each an "Information of District Attorney") charging them each with a

single count of riot based on only their presence at the protest in front of Cider Riot on

May 1st.

93.     The secret indictments were dated August 12, 2019.  They were prepared, and upon information belief, executed by defendant Kalbaugh on behalf of defendant Underhill.

94.     At the time the secret indictments were prepared, defendants Kalbaugh, Underhill, and Hughey, had reviewed the video of the protest at Cider Riot.

95.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that plaintiffs had not engaged in any criminal act during the protest at Cider Riot.

96.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that plaintiffs had not engaged in any violent act during the protest at Cider Riot.

97.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that plaintiffs had not engaged in any act of trespass during the protest at Cider Riot.

98.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that plaintiffs had not engaged in any act constituting physical threats during the protest at Cider Riot.

99.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that neither plaintiff had challenged anyone to fight them during the protest at Cider Riot.

100.     Based upon that review, defendants Kalbaugh, Underhill, and Hughey, knew that neither plaintiff had pushed Heather Clark during the protest at Cider Riot.

101.     On August 12, 2019, Kalbaugh signed and caused to be filed two "Affidavit[s] in Support of Arrest Warrant" making multiple false or misleading statements against plaintiffs, including but not limited to:

- Plaintiffs were "physically threatening members of the Antifa group";

- Plaintiff Gibson "repeatedly challeng[ed]" members of the Antifa group to fight him; and

- Plaintiff Gibson was "physically pushing Heather Clark".

102.   At the time Kalbaugh signed and caused to be filed the Affidavits he knew that charges against Gibson and Schultz could not be pursued without including his above identified false statements in the declaration.

103.   Attached as Exhibit 3 are true copies of the August 12, 2019 affidavits signed and filed by defendant Kalbaugh.

104.   The allegation concerning Heather Clark was of particular significance, because Ms. Clark had been knocked unconscious by a third party at the protest when she charged into a group of individuals outside Cider Riot, and her injuries were widely reported within the City of Portland.

105.   At the time that Kalbaugh submitted the affidavit he had full access to, and upon information and belief had viewed, the videos of the events of May 1st, including Gibson's livestream video, and the police reports from members of the Portland Police Bureau.  Kalbaugh knew that Gibson and Schultz had not engaged in riot at the time he signed and filed that affidavit.

106.   The statements concerning plaintiffs were deliberately false insofar as all the relevant conduct was captured on video recordings available to defendants, the event was not of great duration, and the falsity of the testimony could readily be confirmed by viewing the video.

107.    But for the false claims, no probable cause for prosecution of plaintiffs could be established, as the remaining information in the affidavit was insufficient to establish that plaintiffs had committed any crime, and the conduct giving rise to damages would not have occurred.

108.    At no time did any defendant have either an objectively reasonable or actual subjective belief that plaintiffs had committed the crime of riot under Oregon law.

109.    Notwithstanding the repeated false accusations by Wheeler and others that plaintiffs were "white supremacists," the Affidavit identifies plaintiff Gibson as an "Asian male".

110.    The false and malicious charges against plaintiffs were not only in retaliation for past political activity, but it was also perpetuated specifically to chill future political activity by plaintiffs and others of their class.  At all relevant times, the primary purpose of defendants was to chill the exercise of First Amendment rights by plaintiffs, not bring them to justice under Oregon criminal law.

111.    Defendants knew and or believed that by openly prosecuting clearly innocent individuals, Gibson and Schultz, it would send a message to peaceful conservative and Christian protesters that they do not have First Amendment rights in Multnomah County or the City of Portland.

112.    Defendants pursued plaintiff Schultz in Case No. 19CR53035 and plaintiff Gibson in case 19CR53042.

113.    The prosecution and arrests of plaintiffs would not have occurred but for the prior (and anticipated future) political activity of Mr. Schultz and Mr. Gibson.

114.    On Thursday, August 15, 2019, plaintiff Gibson provided defendant Kalbaugh with an extensive sworn statement explaining the events of May 1, 2019 and his role in them, requesting that the evidence be presented to the grand jury.

115.    Defendant Kalbaugh responded the next day saying he had reviewed Gibson's sworn statement but would not be presenting it to the grand jury.

116.    Also, on or about Thursday, August 15, 2019, proceedings were held before the Grand Jury in Multnomah County, conducted by defendant Kalbaugh, at which defendant Traynor was the principal witness, though he had no personal knowledge of the events at Cider Riot.

117.    Though under a duty pursuant to ORS 132.320 to present "no other evidence [at a grand jury hearing] than such as might be given on the trial of the person charged with the crime in question," Kalbaugh presented essentially nothing but inadmissible testimony from defendant Traynor to the grand jury concerning plaintiffs.

118.    Later, during the later pre-trial criminal proceedings against plaintiffs, defendants Kalbaugh and Hughey did not even oppose motions *in limine* challenging the very same testimony that defendant Traynor gave at the grand jury hearing as inadmissible under the evidence rules.

119.    Though the investigation had failed to uncover any evidence showing riotous conduct by plaintiffs Schultz or Gibson (and in fact all evidence proved their innocence), Kalbaugh and Traynor worked together to present false testimony to the grand jury that falsely asserted that Det. Traynor had reviewed video evidence that showed plaintiffs personally engaging in acts that were riotous within the meaning of ORS 166.015.

120.    There was no such video evidence.

121.    Defendant Traynor went so far as to testify to the grand jury that there was "no doubt whatsoever" the video he reviewed showed Mr. Schultz and Mr. Gibson engaging in acts that were violent and tumultuous.

122.    None of the other witnesses that testified at the Grand Jury described any violent or tumultuous conduct engaged in by Gibson.

123.    None of the other witnesses that testified at the Grand Jury described any violent or tumultuous conduct engaged in by Schultz.

124.    Having failed to present any evidence of riotous conduct by Gibson or Schultz, defendant Kalbaugh asserted, in the form of a leading question to defendant Traynor "Detective, I wanted to ask you just another follow-up question. In your investigation, when you went through this video, we already covered the fact that you were able to identify Joseph Gibson, … [and] Russell Schultz ….  In reviewing the video, do you have any doubt that those people I just named were engaging in acts that you would describe as violent and tumultuous?"

125.    Defendant Traynor responded "I have no doubt whatsoever", even though he knew his testimony to be false.

126.    Defendant Kalbaugh knew the testimony to be false.

127.    Both defendant Traynor and defendant Kalbaugh had watched the videos and knew there was no violent and tumultuous conduct by Gibson and Schultz.

128.    When defendant Kalbaugh asked "Detective, I was going to also ask you, while I have you up here, in viewing the video, did you -- in some of the video you can

see Joey Gibson holding a cell phone and apparently making a video of his own, did you ever get to view and listen to the video he made" defendant Traynor responded "I did".

129.    Traynor also testified that he had viewed the video Gibson of the protest that Gibson had livestreamed on social media and that there was no evidence that the video been edited.

130.    Kalbaugh did not show all the available video of the event to the Grand Jury.

131.    Instead, Kalbaugh only showed the Grand Jury selected portions of the available video so as to craft a false narrative.

132.    In reality, Mr. Gibson carried a phone recorder with him for the entire event that recorded all of his activity.  Numerous others also recorded the event and their video was acquired by defendants before the grand jury hearing.

133.    All of the recordings of the protest document plaintiffs' activity and show they did not engage in riot within the meaning of ORS 166.015.

134.    None of the conduct by Gibson and Schultz at the protest was beyond the scope of protected First Amendment expressive speech and conduct.

135.    Defendant Kalbaugh chose to show only limited portions of the video of the May 1, 2019, event to the grand jury, forcing the grand jury to rely on the false testimony from Det. Traynor.

136.    The grand jury would not have indicted but for the false testimony of defendant Traynor that was proffered by defendant Kalbaugh.

137.    It was because Kalbaugh knew that there was no basis in fact for the grand jury to indict Gibson and Schultz that he did not show all available protest video to the grand jury, but instead proffered the false testimony from defendant Traynor.

138.    Upon information and belief, defendant Hughey worked directly with defendant Kalbaugh at all relevant times and was a willing participant in the conspiracy.

139.    Upon information and belief, defendants Hughey, Kalbaugh, and Traynor willingly participated in the conspiracy at the direction of defendants Underhill, Wheeler and Outlaw.

140.    Upon information and belief, the actions of defendant Hughey, defendant Kalbaugh, defendant Traynor, and defendant Underhill were undertaken following pressure from defendant Wheeler and defendant Outlaw.

141.    Upon information and belief, defendant Traynor had kept defendant Wheeler and defendant Outlaw fully advised of his investigation into the Cider Riot protest.

142.    Upon information and belief, defendants Outlaw and Wheeler directed and ratified the conduct of defendant Traynor alleged herein.

143.    At the time charges were pursued against Gibson and Schultz, defendants Wheeler and Outlaw had full access to all video of the protest.

144.    On information and belief, at the time charges were pursued against Gibson and Schultz, defendants Wheeler and Outlaw had viewed the video of the protest.

145.    On information and belief, at the time charges were pursued against Gibson and Schultz, defendants Wheeler and Outlaw had instructed Traynor to focus his

efforts on Gibson and Schultz, and to ignore the criminal acts of the Antifa members at the protest.

146.    At all relevant times, all defendants had access to unmistakable evidence of the innocence of plaintiffs in their possession, and were aware of plaintiffs' innocence, yet continued to conspire with the other defendants to persecute plaintiffs.

147.    Upon information and belief, defendant Hughey worked directly with defendant Kalbaugh at all relevant times and was a willing participant in the conspiracy.

**Further Overt Actions in Furtherance of the Conspiracy**

148.    Defendants sought to obtain, and did, secret warrants for Gibson and Schultz in advance of the August 17th rally.  Their hope was to use those warrants to arrest him immediately before the rally and remove him from any role in the event.

149.    Defendants would not have been able to obtain the secret warrants without the support of the false Affidavits from defendant Kalbaugh.

150.    Only three days after defendants manipulated the grand jury, on Sunday, August 18, 2019, defendant Wheeler issued an e-mail to defendants Traynor, Outlaw and others, in which he bragged that the bogus charges against Mr. Schultz and Mr. Gibson "had a chilling effect" on plaintiff's political activity at the August 17th rally and protest.

151.    Attached as Exhibit 4 is a true copy of that email.

152.    Through that e-mail and other conduct, defendants Wheeler and the City of Portland ratified the illegal police conduct producing the bogus charges, and further advanced the illegal customs and policies alleged herein.

153.    As a result of the warrant, Plaintiff Schultz was arrested at his home in Washington State and spent five days in jail before he was even arraigned, and after

release continued to suffer infringement of his right to liberty through a requirement of weekly contact with probational authorities.

154.    During this process a law enforcement agent told Schultz that he had been arrested because defendant Wheeler had "pressured" defendant Underhill to pursue criminal charges against him and others present at the Cider Riot protest, including defendant Gibson.

155.    Upon information and belief, defendants Wheeler, Underhill, and others had come to an illegal agreement to accomplish this objective during the August planning processes alleged above.

156.    Plaintiff Schultz was totally innocent, and all of the above-referenced individuals knew that to be the case when they conspired to have him prosecuted, and continued that conspiracy for three years.

157.    Plaintiffs Gibson and Schultz both spent time in custody as a result of the conspiracy and were subject to restrictions on their liberty for three years.  They suffered reputational damage.

158.    Plaintiff Schultz received an offer of employment with CBRE in November of 2019.  The offer included a six-figure annual compensation plan for Schultz.  However, when CBRE conducted a background check they learned of the felony riot charge against Schultz and withdrew the offer of employment.

159.    Upon reviewing the criminal case discovery provided by defendants Underhill, Kalbaugh and Hughey, counsel for plaintiffs Gibson and Schultz filed a sworn declaration in the criminal proceedings on October 25, 2019, in support of a demurrer, which testimony confirmed that there was no evidence of any act of plaintiffs that could

be considered as "violent and tumultuous" for purposes of the riot statute, and it was clear that at all relevant times, plaintiffs were exercising rights of free expression when assaulted by patrons of Cider Riot.

160.    Attached as Exhibit 5 is a copy of the demurrer.

161.    Counsel for plaintiff Gibson also confirmed that there was no evidence that plaintiff Gibson had pushed Heather Clark, and that the record of Ms. Clark's interview by Traynor did not even contain any assertion that she had been pushed by Gibson, and indeed confirmed that Traynor understood from Clark herself that Gibson was trying to hold Clark back when Clark attempted to charge through him.  This and other conduct repeatedly continued to put defendants on notice of the lack of any evidence to support criminal prosecutions.

162.    An investigator for the Oregon Liquor Control Commission, not bound by the custom, practice and policy alleged herein, and not a member of the conspiracy alleged herein, would later highlight her report of the May 1st events at Cider Riot with a picture captioned: "Picture of victim Heather Clark (PPB Report 19-131483) attacking Joey Gibson".  She recommended that multiple charges be brought against Cider Riot for violations of Commission rules.  Upon information and belief, defendants exercised influence to make sure those charges were never pursued.

163.    While defendants were expending efforts to persecute plaintiffs Gibson and Schultz for a crime they did not commit, defendants refused to prosecute those they knew to be guilty of serious crimes simply because those other individuals expressed political viewpoints shared by defendants.

164.    While violent crime and property crime was skyrocketing in Multnomah County, the conspirators busied themselves prosecuting these two innocent men.

165.    It is abundantly clear that the purpose of the scheme was to make an example of plaintiffs Gibson and Schultz so as to send a message to conservatives that they are not welcome in the Portland area and that if they dare to protest in Multnomah County they will be prosecuted even when it is obvious, they are innocent.

166.    On or about December 31, 2019, defendant Outlaw resigned as Chief of Police and was replaced by defendant Jami Resch.

167.    On March 6, 2020, Mr. Schultz's initial defense lawyer had a conversation with Deputy defendant Kalbaugh about the case and told him there was no evidence of any violent or tumultuous conduct by plaintiff Schultz and she wanted to know why Schultz had been charged with a crime.  Defendant Kalbaugh did not deny her assertion that there was no evidence against Mr. Schultz, nor did he claim she was wrong, nor did he identify any violent or tumultuous conduct committed by Schultz.  Rather, Kalbaugh admitted that Schultz was being prosecuted simply because he was standing in the location of others at the protest, and specifically because he was standing next to Gibson.

168.    On April 21, 2021, counsel for Schultz later executed a Declaration offering testimony concerning these events under oath, which was filed in the criminal action, providing further notice to defendants of the lack of any basis for maintaining criminal prosecutions of plaintiffs.

169.    Attached as Exhibit 6 is a copy of that declaration.

170.    Also on March 6, 2020, defendant Kalbaugh told the Multnomah County Circuit Court:  "Your Honor, if the State was charging Mr. Gibson with assault, the State

can see that Mr. Gibson would have a very good basis to say, 'How am I being charged with assault? I don't see anything of me assaulting anyone.'"

171.    On June 6, 2020, after a series of BLM and Antifa riots in Portland, defendant Wheeler directed defendant Resch to halt the use of tear gas to control Portland riots absent "a serious and immediate threat to life safety," removing one of the few effective tools the Portland Police Bureau had to control Antifa rioting.  Defendant Wheeler also halted use of LRAD (Long Range Acoustics Devices) to disperse crowds.

172.    On or about July 5, 2020, Antifa member, Michael Reinoehl was arrested for possessing a loaded gun in a public place, resisting arrest, and interfering with police. But by July 30th, the MCDA had dropped all charges.

173.    Reinoehl later murdered Aaron Danielson on August 29, 2020, during other protests.  Danielson was a friend and supporter of plaintiff Gibson, and was wearing a "Patriot Prayer" hat when he was murdered.

174.    A day before Reinoehl murdered Aaron Danielson, Reinoehl attended a conservative rally in Camas, Washington that Gibson had publicly announced he would attend.  Reinoehl was in disguise, stalking Gibson, and was wearing exactly what he would later wear when he murdered Danielson.

175.    Danielson and Gibson had arranged to meet each other in downtown Portland the day of the murder, and in fact Gibson was only a couple of blocks from Danielson, and walking towards the meeting location, when Reinoehl (who was lying in wait) ambushed Danielson and murdered him in a cold blood.

176.    The Governor of Oregon, a political ally of defendants, and upon information and belief a member of the conspiracy alleged herein, responded to the

murder of Danielson by issuing a press release stating that "Patriot Prayer" and others had been "armed and looking for a fight" and that "Patriot Prayer and armed white supremacists" were "bring[ing] more bloodshed to our streets".

177.    The Governor's statement was false and inflammatory.

178.    On information and belief, before the Governor issued that statement she had been in consultation with some or all defendants about the murder of Danielson by Reinoehl.

179.    Statements by defendants and their allies blaming plaintiffs and members of their class for violence initiated by Antifa are part of the continuous campaign of defamation in service of the objectives of their unlawful conspiracy.

**Formalization of a Portion of the Unconstitutional Custom, Policy and Practice**

180.    On or about August 1, 2020, defendant Schmidt took over the MCDA.

181.    On information and belief, after defendant Schmidt took over the office, he was fully briefed on the prosecution of Gibson and Schultz by defendant Kalbaugh and defendant Hughey.

182.    Being fully advised of the facts of the case, and knowing Gibson and Schultz to be innocent, defendant Schmidt ratified the continued prosecution of Gibson and Schultz.

183.    On August 11, 2020, defendant Schmidt officially adopted a formal policy ("Policy") presumptively declining to prosecute riot cases under ORS 166.015 when not accompanied by allegations of more serious crimes.  In practice, the Policy formalized a portion of the preexisting custom, practice and policy of defendants to not prosecuting riot and other cases where those that the police had accused of riot were involved in an

event related to political activity of which defendants approved. More specifically, defendant Schmidt would limit prosecutions if the alleged rioter was supporting a liberal cause, but no such limits applied to continued and future prosecution of conservatives.

184.    The Policy adopted by Schmidt was not created by defendant Schmidt himself, but was provided to him in substantially complete form by an out of state group called "The Wren Collective, LLC," a firm described on its website (wrencollective.com) as "Strategic Advising for Social Change," serving "clients who want to take the bold action needed to radically transform the criminal legal system".

185.    The Wren Collective bragged that it "will show you which levers need to be pulled to obtain radical transformation, and then we help you pull them."

186.    The group was working secretly with defendant Schmidt by mid-June. In an email from Amy Webber to defendant Schmidt on June 16th, she bragged that the Wren Collective worked with "elected prosecutors all over the country" and did its work in the shadows "without any billing or publicity".

187.    On information and belief, the Wren Collective was paid thousands of dollars for their services by an outside group and the cost of that services was never reported by defendant Schmidt in any campaign disclosure or any other public disclosure.

188.    Schmidt was introduced to the Wren Collective in an email on Jun 11, 2020, from Portland area political supporter of Schmidt, David Menschel. Menschel used his personal Gmail account to make that introduction.

189.    Menschel was a public supporter of Schmidt's 2020 campaign.

190.    On June 21, 2020, Jessica Brand, head of the Wren Collective wrote in an email to Schmidt's private account to schedule a private call so that the substance of their communication would not be documented in writing.

191.    Amy Webber, of the Wren Collective, provided Schmidt a first draft of the Policy on July 24, 2020, at which time it included a provision that there would be no charges filed for the crime of felony riot unless in addition to the rioting by the individual accused of personally rioting there was also "property damage, theft, or the use or threat of force against another person."

192.    Attached as Exhibit 7 is a copy of the above-referenced draft policy.

193.    She sent that policy in an email to Mike Schmidt's private email account, not a county email account.  Webber would also use her personal Gmail account on occasion, when communicating with Schmidt, as opposed to her official Wren Collective account.

194.    Also included in the emails with the Wren Collective was Multnomah County District Attorney's Office Policy Director Aaron Knott.  Knott also used his personal email accounts for communications with the Wren Collective.

195.    Mike Schmidt then forwarded that draft of the Policy to the private email account for Jeffrey A. Howes, who was, and is, the First Assistant District Attorney for the Multnomah County District Attorney's Office.

196.    Jeffrey A. Howes held this position under defendant Underhill and defendant Schmidt.

197.    Notwithstanding discovery in a federal action discussed below, very little information was produced concerning evolution of the Policy is available beyond

defendant Schmidt's limited interactions with the Collective. Defendants in a subsequent federal action never fully complied with discovery obligations, and produced documents confirming the incompleteness of the limited productions they did make.

198.    For example, on July 1, 2020, defendant Schmidt wrote an e-mail in which he referred to a "case" and "commitment" presented in a meeting with "local officials" the day before concerning policies for prosecuting protestors but produced no documents concerning this meeting.

199.    Defendant Schmidt, and upon information and belief other defendants, have a pattern and practice of communicating concerning their illegal custom, practice, policy and conspiracy on personal devices and through personal e-mail and other accounts, so as to avoid the release of materials pursuant to media and other requests under the Oregon Public Records Act.

200.    On or about August 11, 2020, defendant Schmidt made the selective prosecution policy formal.

201.    Attached as Exhibit 8 is a copy of the formal policy instituted by Schmidt.

202.    The policy formalized the second-class status of conservative protestors in Multnomah County while granting license to Antifa and BLM to riot with de facto legal immunity.

203.    Defendant Schmidt announced the policy publicly.

204.    The policy was then applied retroactively to all active prosecutions with the exception of the prosecution of those protesting against Antifa at Cider Riot (plaintiffs).

205.    As a result of the retroactive application, many cases that were charged before the policy was put into effect were dismissed by operation of the policy.

206.    All of those cases dismissed were ones where the rioter was rioting during and in support of a left wing (Antifa or BLM) protest.

207.    On August 10, 2020, a Leftist leader, Demetria Hester was arrested while participating in riots involving rioters throwing two-inch rocks, full bottles of water and other projectiles at officers, and using mortars that blew up on officers.  Her charges were immediately dismissed by the MCDA, who claimed it was in the "interests of justice", a pattern that would persist when police managed to arrest those with leadership roles in leading public disorder in Portland.

208.    On or about August 12, 2020, counsel for plaintiff Schultz sent an email to defendant Kalbaugh asking that Schultz case be dismissed.

209.    On or about August 11, 2020, counsel for plaintiff Gibson wrote to defendant Kalbaugh, seeking application of the Policy to Gibson's case, and pointing out that Gibson's role in the Cider Riot protest, like that of Hester in the BLM protest, was that of a speaker.

210.    Attached as Exhibit 9 is a copy of the email string between Gibson's defense counsel and defendant Kalbaugh mentioned above.

211.    Defendants Kalbaugh and Hughey then had a private meeting with defendant Schmidt to discuss the cases against Gibson and Schultz.

212.    On information and belief, during the meeting defendants Kalbaugh, Hughey, and Schmidt discussed the lack of evidence to support any criminal charges against Gibson and Schultz.

213.    On information and belief, defendants decided not to deny Gibson and Schultz the benefit of the policy because of the political and/or religious beliefs of Gibson and Schultz as publicly expressed in the City of Portland.

214.    On information and belief, defendants agreed to continue to pursue a meritless prosecution as a form of process punishment on Gibson and Schultz and to keep them subject to pretrial conditions for as long as possible.

215.    On information and belief, this was done to chill political activity of Gibson and Schultz.

216.    On information and belief, defendant Wheeler expressed to Schmidt his desire to have the prosecution of Gibson and Schultz continue despite the new selective prosecution policy.

217.    Defendant Kalbaugh, after the meeting with defendant Schmidt, falsely insisted  that the Policy was not intended to be retroactive and would not be applied to plaintiffs Gibson (or Schultz).

218.    Kalbaugh also refused to allow counsel for Gibson to attend his meeting with Schmidt, so as to answer questions, show relevant portions of the videos, and otherwise establish Gibson's innocence.

219.    Despite claims of Kalbaugh and Schmidt to the contrary, the Policy was in fact applied retroactively to all other protest cases except plaintiffs.  That is to say all other previously filed stand-alone riot cases that had previously been charged were dismissed.

220.    On or about August 13, 2020, Schmidt told the Washington Post that the new policy would be retroactive for hundreds of people arrested in riots relating to protests over the death of George Floyd.

221.    On August 23, 2020, faced with a New York Times reporter questioning his decision to dismiss hundreds of criminal charges arising from Antifa-related protests occurring since May 2020, defendant Schmidt said:  "At a time when legitimacy in our criminal justice system is probably at an all-time low, we can't be seen as using that very system to silence the speech that is being critical of it."

222.    Defendant Schmidt nonetheless told the New York Times that the cases of Gibson (and thus Schultz) merited prosecution.

223.    On August 29, 2020, faced with a pre-announced pro-Trump political rally in the form of a car caravan intending to drive through downtown Portland, defendant Wheeler and defendant Lovell blocked freeway off-ramps in the city of Portland in an attempt to keep conservative protesters out of the downtown area and restrain their political activity based on the viewpoint expressed by that activity.

224.    A persistent pattern has emerged of defendants Wheeler and other Portland authorities permitting Antifa members to blockade streets (and even I-84) to aid their protests, while defendants themselves blocked streets to prevent conservative protestors such as Schultz and Gibson from accessing and participating in events in Portland.

225.    On September 9, 2020, defendant Wheeler introduced and procured passage of an ordinance, No. 190113, to bar the Portland Police Bureau and other City offices from utilizing facial recognition systems which Antifa and its political allies

feared could result in their arrests. As a general matter, defendants failed to take reasonable efforts to identify Antifa suspects in the ongoing riots within the City of Portland, and even when police captured particular Antifa members rioting on multiple occasions, failed to follow through with criminal prosecutions.

226. On September 21, 2020, the United States Department of Justice issued findings that Portland was one of three jurisdictions "that have permitted violence and destruction of property to persist and have refused to undertake reasonable measures to counteract criminal activities," even though "Portland [had] marked 100 consecutive nights of protests marred by vandalism, chaos, and even killing".

227. Notwithstanding a target-rich environment of Antifa rioters attacking police and destroying property, defendants continued to prosecute Schultz and Gibson for their prescient efforts to draw attention to the dangers presented by Antifa, while dismissing nearly all cases against Antifa protestors.

228. On September 22, 2020, shots were fired near a demonstration outside the Multnomah County Sheriff's Office at 4735 E. Burnside Street by Antifa elements, sending two people to the hospital. The Portland Police Bureau announced that the gunfire in a residential community posed "no threat to the community" and, upon information and belief, made no arrests.

229. On September 23, 2020, defendant Wheeler continued his public tirades against plaintiffs and other right of center political protestors, warning that on September 26th, "alt-right groups and white nationalists are intent on coming into our community. These groups empower racism, intolerance and hate. Those are not Portland values, and they are not welcome. Hate has no home in Portland."

230.    Through a public statement, on September 25th, defendant Wheeler admitted that "Portland has a long history of opposing far-right organizing," confirming the ongoing custom, practice, policy and conspiracy to misuse governmental power to deny plaintiffs and others of their class their fundamental constitutional rights in Portland.

231.    Though defendant Wheeler had banned the use of tear gas against Antifa, defendant Wheeler made a special exception for its use in connection with the September 26th conservative gathering.

**Prior Federal Proceedings against the MCDA and Schmidt**

232.    In the meantime, on September 11, 2020, plaintiffs Schultz and Gibson commenced an action in federal district (3:20-cv-01580-SB) seeking to enjoin their felony prosecutions as an unconstitutional exercise of selective and retaliatory prosecution by defendants Schmidt, MCDA and Kalbaugh.

233.    Defendants Schmidt, MCDA and Kalbaugh, were represented by the Oregon Department of Justice in the federal litigation.

234.    A detailed examination of MCDA's charging decisions that resulted from the discovery obtained by plaintiffs in the federal case showed a consistent pattern of excusing extreme and violent conduct by Antifa members, while pursuing serious charges against their political opponents in similar circumstances (or less egregious conduct by the political opponents).

235.    Discovery in the federal case confirmed that defendant Schmidt had applied the policy retroactively to all cases that had been charged prior to the institution of the policy, with the exception of the single consolidated case against Schultz, Gibson

and one other co-defendant.  No riot cases alleging only a single stand-alone riot charge, that is to say factually similar to the charge against plaintiffs Schultz and Gibson, were charged or continued by defendants; and all of the riot cases that were charged against Antifa defendants involved at least one crime in addition to riot.

236.    The discovery also revealed numerous charging decisions by defendant Kalbaugh in which he personally articulated an entirely different view of the law than he was falsely advocating in the prosecutions of Schultz and Gibson.  Explaining to a Portland police officer why he would not prosecute one Antifa rioter, Kalbaugh said: "Mere proximity to people rioting does not satisfy the legal requirement of 'engaging in tumultuous and violent conduct'".

237.    Yet at the same time he continued to prosecute Schultz simply for standing next to Gibson during the protest.

238.    In an effort to escape the jurisdiction of the federal court, defendant Kalbaugh submitted a declaration to the federal court that incorporated and attached his earlier false declaration from August 12, 2019.  Kalbaugh did this knowing that the declaration contained false information.

239.    Attached as Exhibit 10 is a true copy of that declaration (3:20-cv-01580-SB, Doc. No. 54), without its exhibits.

240.    In his declaration, defendant Kalbaugh also admitted to the federal court that he had reviewed the discovery in the case and that "the evidence against [Schultz] did not include show him physically assaulting anyone."

241.    The federal judge concluded, in an Opinion and Order issued February 26, 2021, that "Plaintiffs make compelling arguments that their conduct does not rise to the level of 'tumultuous and violent' conduct under O.R.S. 166.015."

242.    However, the Court declined to take jurisdiction over the criminal prosecution due to the federal doctrine known as "*Younger* abstention."  Accordingly, the federal court was compelled to abstain from evaluating the merits of plaintiffs' selective prosecution claim and dismissed the action without prejudice, making it clear that "this Court is not opining on the ultimate validity of their selective prosecution claim".

243.    When concluding that the court was barred from accepting jurisdiction due to the *Younger* abstention doctrine, the federal judge relied upon the false declarations executed by defendant Kalbaugh back on August 12, 2019, to conclude that detectives observed video of defendants "taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation".

244.    Despite declining jurisdiction over the matter, the court wrote that "Defendants failed to provide any justification for the non-prosecution policy or explain why it was not evidence of Defendants' bias against Plaintiffs.  . . . At the hearing, counsel for Defendants raised resource considerations for the very first time in this litigation as the purpose of the policy, without offering any evidence to support her position, other than the language of the policy itself.  Inexplicably, counsel for Defendants also completely ignores Plaintiffs' argument that the fact that no Antifa members were charged in the Cider Riot incident on May 1, 2019 shows Defendants' animus toward Plaintiffs' viewpoint."

### Further Misconduct in Furtherance of the Conspiracy

245.    On or about October 23, 2020, Kalbaugh told the Multnomah County Circuit Court that he understood that riotous conduct involved what he characterized as "terrorist mob behavior involving ominous threats of personal injury and property damage," yet defendants continued to pursue the prosecution of these two innocent men despite having no evidence of such activity.

246.    On July 23, 2021, the Multnomah County Circuit Court denied a motion filed by plaintiffs to dismiss the criminal proceedings for selective prosecution.  The Court ruling relied on the false representation by defendants Kalbaugh and Hughey that the non-prosecution Policy was not retroactively applied and was "only ever intended to be forward looking".

247.    The Court did, however, write that after review of video evidence it appeared to the Court that none of the evidence presented on the motion—evidence "that appears to capture the entirety of the event giving rise to the filed charges"—showed defendants Schultz or Gibson "engaging in [affirmatively violent physical] behavior".

248.    However, in Oregon State criminal court (unlike in other states), the trial court is not authorized to dismiss a prosecution for lack of evidence as a matter of law until after the State has rested its case in chief during the actual trial.

249.    At the trial, the prosecution, led by defendant Kalbaugh with the continuing assistance of defendant Hughey, under the supervision of defendant Schmidt, called multiple eyewitnesses to the May 1, 2019 protest.  Not one of them, including Heather Clark, testified that either Schultz or Gibson did anything that day that was violent or tumultuous.

250.    Heather Clark testified that Gibson's conduct that day was mostly walking around, talking, and livestreaming.  None of the witnesses testified to any physical conduct of Gibson or Schultz that was not already on the videos that the defendants had in their possession for the over three years that they persecuted plaintiffs without evidence.

251.    On July 19, 2022, when the prosecution rested its case during the trial, it was the very first opportunity under Oregon law for the Multnomah County Circuit Court to rule on plaintiff's motion to dismiss. The court, having reviewed the video evidence and heard all of the witness testimony granted plaintiffs' motion for acquittal at the close of the State's case, finding that there was no evidence of riotous conduct by Schultz or Gibson.

252.    The Judge remarked that:  "The state is trying to convict Mr. Schultz for being present at an incident that violence occurred, and they cannot do so.  I am somewhat bewildered that the State has driven the case to this point.  As an institution, the district attorney's office's decision to push this case to trial is surprising, given the state of the evidence."

253.    As the Judge explained, "If the defendant could be convicted of riot in this case, there would be no protection for protesters in Oregon.  If being there and using your body to take up space is sufficient, then any protester runs the risk of arrest if it turns out that tumult ensues."

254.    As a result of the Judge's ruling, the ultimate question of selective prosecution, which the Court had reserved for a possible evidentiary hearing on a motion for arrest of judgment was never reached.

255.   The conduct of defendants as alleged above was malicious, or at least in reckless or callous disregard of, or indifference to the rights of plaintiffs.

256.   Plaintiffs have been damaged in their liberty, property and reputation by defendants' conduct in an amount to be proven at trial, presently estimated at $100 million, and are entitled to punitive damages.

257.   The direct economic damages include lost income and attorney fees and costs for defending against the criminal charges, as well as pursuing Case No. 3:20-cv-01580-SB, which costs would not have been incurred but for defendants' unlawful conduct, and presently estimated at $115,000.

**FIRST CLAIM FOR RELIEF:  VIOLATION OF 42 U.S.C. § 1983**

258.   Plaintiffs reallege paragraphs 1 through 257 as if set forth herein.

259.   Plaintiffs were deprived of rights guaranteed to them under the U.S. Constitution by defendants, acting under color of state law, in one or more of the following particulars:

(a)   Plaintiffs were deprived of their rights of free speech and to peaceably assemble under the First Amendment, free from governmental retaliation;

(b)   Plaintiffs were deprived of their rights to fair judicial proceedings under the Fifth Amendment;

(c)   Plaintiffs were deprived of their right to travel to the City of Portland, protected under the Fifth Amendment and/or the Privileges and Immunities Clause of the Fourteenth Amendment;

(d)   Plaintiffs were deprived of their right to equal protection of the laws under the Fourteenth Amendment; and

(e)     Plaintiffs were deprived of their liberty and property by reason of defamation by defendants.

260.    The foregoing facts establish one or more customs or policies which inflicted the injuries upon plaintiffs, including but not limited to:

(a)     On the part of defendants City of Portland, Wheeler, Outlaw, Resch, Lovell, to defame plaintiffs, abuse police powers to insulate plaintiffs' political opponents from liability for criminal misconduct, and abuse law enforcement authority to falsely accuse plaintiffs of criminal conduct.

(b)     On the part of defendants Multnomah County, MCDA, Underhill, Schmidt, Kalbaugh and Hughey to defame plaintiffs, selectively prosecute plaintiffs, and abuse prosecutorial discretion to insulate plaintiffs' political opponents from liability for criminal misconduct.

(c)     On the part of all defendants, to promote such hatred of plaintiffs and other members of their class that they will be physically attacked by the protected political opponents if they dare to visit the City of Portland to exercise their federally-protected rights of free speech and the right to peaceably assemble, in order to bar them and members of their class from any appearance in Portland.

261.    The foregoing facts establish that the City of Portland and Multnomah County ratified the conduct of its officials as alleged herein.

**SECOND CLAIM FOR RELIEF:  VIOLATION OF 42 U.S.C. § 1985**

262.    Plaintiffs reallege paragraphs 1 through 261 as if set forth herein.

263.    Defendants conspired to deprive plaintiffs of federally-protected rights as alleged above, and at least one of the conspirators did an overt act in furtherance of the

conspiracy, which did injured plaintiffs in their person and property and deprived them of rights and privileges of American citizens.

### THIRD CLAIM FOR RELIEF:  VIOLATION OF 42 U.S.C. § 1986

264.    Plaintiffs reallege paragraphs 1 through 263 as if set forth herein.

265.    Defendants Wheeler and Schmidt had knowledge of the wrongs to be committed, had it within their power to prevent or aid in preventing the commission of the same, but failed to do so, in violation of 42 U.S.C. § 1986.

### FOURTH CLAIM FOR RELIEF:  TORT

### Count 1:  Defamation

266.    Plaintiffs reallege paragraphs 1 through 265 as if set forth herein.

267.    Defendants published false, defamatory and unprivileged statements concerning plaintiffs that damaged plaintiffs in their reputation and property.

268.    Defendants' statements were *per se* defamatory.

### Count 2:  Malicious Prosecution

269.    Plaintiffs reallege paragraphs 1 through 268 as if set forth herein.

270.    Defendants insisted upon the initiation and continuance of criminal proceedings against plaintiffs, which ultimately terminated in plaintiffs' favor, had malice instituting such proceedings, and did so without probable cause for doing so.

### Count 3:  False Arrest and Imprisonment

271.    Plaintiffs reallege paragraphs 1 through 270 as if set forth herein.

272.    Defendants caused plaintiffs to be arrested and confined, intended to cause such arrest and confinement, plaintiffs were aware of the arrest and confinement, and such arrest and confinement were unlawful.

**Alternative Count 4:  Negligence**

273.    Plaintiffs reallege paragraphs 1 through 272 as if set forth herein.

274.    Defendants' conduct unreasonably created a foreseeable risk to plaintiffs' liberty, property and reputational interests, and proximately caused injury to those interests.

**PRAYER FOR RELIEF:**

WHEREFORE, plaintiffs pray for judgment as follows:

a.    On all claims for relief for an award of such damages to be proven at trial, for punitive damages, for reasonable attorney and for expert fees and costs pursuant to 42 U.S.C. § 1988;

b.    For their costs of suit; and

c.    For such other and further relief the Court deems proper.

Dated: June  8 , 2023.

Respectfully submitted,

*/s/  James L. Buchal*
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP

*/s/ D. Angus Lee*
D. Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC

*Attorneys for Plaintiffs*

Page 47: COMPLAINT

*ANGUS LEE LAW FIRM,*
*PLLC*

&

*MURPHY & BUCHAL,*
*LLP*

Tuesday, September 6, 2022 *Anno Domini*

**BY FIRST CLASS MAIL AND E-MAIL**

Mayor Ted Wheeler
City of Portland
1221 SW 4th Avenue, Room 340
Portland, OR 97204
E-mail:  mayorwheeler@portlandoregon.gov

Deborah Kafoury, County Chair
Multnomah County
501 SE Hawthorne Blvd, Suite 600
Portland, OR 97214-3587
E-mail:  mult.chair@multco.us

Risk Management
City of Portland
1120 SW 5th Ave, 10th Floor
Portland, OR 97204-1912
E-mail:  LiabilityClaims@portlandoregon.gov
Fax: 503-823-6120

Risk Management
Multnomah County
501 SE Hawthorne Blvd, Suite 400
Portland, OR 97214-3587
E-mail: casey.odonnell@multco.us
Fax:  503-988-5758

Laura Rowan
Deputy City Attorney
Portland City Attorney's Office
1221 SW 4th Avenue, Suite 430
Portland, OR  97204
E-mail:  Laura.Rowan@portlandoregon.gov

Jenny N. Madkour
Multnomah County Attorney
Multnomah County Attorney's Office
501 SE Hawthorne Blvd Ste 500
Portland OR  97214
E-mail:  jenny.m.madkour@multco.us

RE:    **TORT CLAIM NOTICE/DEMAND FOR PRESERVATION OF EVIDENCE**
      Russell Schultz and Joseph Gibson v. City of Portland, Multnomah County, *et al.*

To Whom It May Concern:

        This letter serves as notice of tort claim on behalf of claimant Mr. Russell Schultz and Mr. Joseph Gibson.[1]  Claimants intend to assert claims for damages against the City of Portland, Multhomah County, the Multnomah County District Attorney's Office (MCDA) and officers, agents and employees thereof presently identified as:  Mayor and Portland Police Commissioner Ted Wheeler, Portland Police Chiefs Danielle Outlaw, Jami Resch and Chuck Lovell, Portland Police Detective Christopher Traynor, Multnomah County D.A. Rod Underhill, Multnomah County D.A. Mike Schmidt, Deputy D.A. Brad Kalbaugh, and Deputy D.A. Sean Hughey, engaged in a conspiracy to maliciously prosecute Mr. Schultz and Mr. Gibson without any evidence of a crime in retaliation for, and in order to chill Mr. Schultz and Mr. Gibson from, engaging in political activity protected under the 1st Amendment to the United States Constitution, as detailed below.  Correspondence concerning the claim should be directed to the addresses below.

_____

[1] See ORS 30.275(4).

Angus Lee Law Firm, PLLC
(P) 360-635-6464 (F) 888-509-8268
9105A NE HWY 99, Suite 200
Vancouver, WA 98665

Murphy & Buchal, LLP
(P) 503-227-1011 (F) 503-573-1939
P.O. Box 86620
Portland, OR  97286        Exhibit 1, pg. 1 of 18

## The Circumstances Giving Rise to the Claim

The overall context of the dispute in one in which defendant Wheeler,[2] with the assistance of the other named defendants, has repeatedly misused his authority as Portland Police Commissioner to protect individuals violating the laws of Oregon in the course of demonstrating in favor of political causes he supports, and to persecute individuals assertedly violating those laws while advancing political causes he opposes. The background circumstances show malice in instituting criminal proceedings against plaintiffs Schultz and Gibson.

In particular, defendants are extremely hostile to a set of political beliefs associated with patriotism, religion and limited government advanced by plaintiffs Schultz and Gibson. Such beliefs, sometimes identified with the Republican Party, are held by only a very small minority of residents of Portland, on the order of ten percent. In general, open statement of such views is likely to be met with hostility and intolerance from members of the Portland Community, and defendants have personal and political motives to exercise their governmental authority to discriminate against, repress and violate the fundamental civil rights of this small minority. Indeed, it is by now a custom, practice and policy of the City of Portland and Multnomah County to misuse law enforcement resources to attack members of this small minority, particularly those that have stood up against rising Antifa disorder.

In May 2017, plaintiff Gibson sought and obtained a federal permit for a political event at the Terry Schrunk Plaza in downtown Portland on June 4, 2017. On or about May 29, 2017, defendant Wheeler issued a public statement declaring that the City of Portland "has NOT and will not issue any permits" for any "alt right events," and said he was "calling on the federal government to IMMEDIATELY REVOKE the permit(s) they have issued for the June 4th event and to not issue a permit for June 10th." In the May 29th statement, defendant Wheeler also accused Gibson of "bigotry and hatred". Wheeler had no factual basis for his accusations.

The permit was not revoked, and the event was marred by repeated violent attempts by masked and black-clothed Antifa attackers to disrupt it. Nevertheless, Wheeler's comments were amplified by Portland media, which widely and falsely accused Gibson of being a "white supremacist," "violent, far-right extremist," and one of the "fascist agitators bring[ing] choreographed terror into our community". In a July 2018 interview with the *Oregonian*, defendant Wheeler continued his campaign of defamation, accusing Schultz and Gibson of being "people who come down here [to Portland] and spout their venom." Numerous other City and County officials joined in such commentary.

At the same time, Wheeler was misusing political authority to assist those who were engaging in attacks upon Schultz, Gibson and others attempting to bring attention to the rising problem of Antifa violence in Portland. In August 2018, defendant Wheeler ordered Portland Police not to interfere with Leftist demonstrators camped outside the U.S. Immigration and

---

[2] For clarity and economy of expression, we refer to those against who Schultz and Gibson intend to present damage claims as "defendants," and refer to Schultz and Gibson as "plaintiffs".

Customs Enforcement Field Office in Portland for more than five weeks, trapping workers, stopping traffic, and ultimately shutting down the facility for a week.

In or about October 2018, a reporter from the *Oregonian* wrote an article describing her personal experience attending a rally organized by plaintiff Gibson, reporting "something we need more of: talk that leads to increasing understanding about opposing thoughts and the people behind them." Defendant Wheeler publicly attacked the reporter on Twitter, falsely stating that Schultz and Gibson "embrace" "hate, extremism and violence" and stating, in substance, that there could be no common ground or understanding with plaintiffs. Wheeler's agent and political consultant Jake Weigler, as part of a campaign that was, upon information and belief organized, supported or ratified by Wheeler, urged people to sign a petition calling for the reporter, Elizabeth Hovde, to be fired by the *Oregonian*. She was.

On February 8, 2019, the Portland City Council, led by defendant Wheeler, passed a resolution condemning what it characterized as "a rise of white nationalist, white supremacist and alt-right hate groups, many of which have been emboldened by the words and actions of the current presidential administration," and declaring that "the City of Portland will not tolerate hate in any form . . .". This was widely understood to refer to (among others) the group Patriot Prayer led by plaintiff Gibson, which plaintiff Schultz also supported, and amounted to a declaration of intolerance for the plaintiffs' exercise of their fundamental constitutional rights of free speech.

The Council, including defendant Wheeler, took this action though plaintiff Gibson appeared before the Council, saying he was "here to denounce all forms of white supremacy and hate," explaining his religious position that the solution to hate was love.

On February 14, 2019, defendant Wheeler publicly and falsely attacked plaintiff as the "leader of a group that perpetuates hate speech and violence". The release of that public statement was made in response to attacks on Portland Police Lt. Jeff Niiya, who then commanded the Portland Police Bureau's Rapid Response Team that responded to protests in Portland. Lt. Niiya maintained extensive communications with protest organizers of all political persuasions, but came under public attack for his communications with plaintiff Gibson. According to Wheeler, Lt. Niiya's communications with Gibson, who is of half-Japanese descent, created "a mandate for specific training to identify and combat white supremacy".

On February 15, 2019, Wheeler publicly announced that he and the Chief of Police, defendant Outlaw, "are going to implement training for the Portland Police Bureau around how to identify white supremacy based on the recommendations of the Oregon Justice Resource Center, Council on American-Islamic Releations Oregon and the Western States Center." More specifically, he ordered an "independent investigation to review the existence of bias in the actions of the P.P.B. leading up to and during demonstrations involving alt-right and anti-fascist protesters." Lt. Niiya was removed from the Rapid Response Team.

The custom, practice and policy in substance constituted a conspiracy among policy-level officials to misuse criminal law enforcement resources to target right-wing protestors in Portland Oregon. By March 2019, it was publicly reported that defendant Wheeler had pressured defendant

Underhill to arrest such protestors; his office had previously declined to pursue such prosecutions where it was not clear who the initial aggressor was, making it "legally and ethically questionable to file charges"—compunctions that were abandoned as the MCDA, Underhill and its employees joined the plot.

On May 1, 2019, Gibson and Schultz appeared outside a Portland cider bar, known as Cider Riot, which in substance operated as a headquarters for Antifa within the City of Portland. Upon information and belief, defendants already knew, from the Portland Police Bureau, that Cider Riot was a meeting place for Antifa members engaged in ongoing vandalism and criminal activities, but had taken no meaningful investigative activities at the location.

Plaintiffs were among those who saw Antifa as a very serious criminal threat to public disorder in Portland, Oregon, and believed that a serious law enforcement approach was needed. At this juncture, plaintiffs did not yet appreciate that defendants, though charged to uphold the law in Portland, were, in substance, on the side of Antifa.

Plaintiff Gibson in particular livestreamed his appearance on Facebook, attempting to call public attention to the nature of the bar and its patrons. Neither Gibson nor Schultz committed any acts of violence (though they were repeatedly and violently attacked by the Antifa patrons of the bar), and both repeatedly urged others outside the bar *not* to engage in violence.

Multiple members of the Portland Police Bureau, including at least one plainclothes officer and aerial surveillance, watched all the events at Cider Riot on May 1st, but took no action to halt any of the conduct they observed. Plaintiff Gibson himself broadcast during the event that Antifa was engaging in a "riot at Cider Riot," and someone should "call the police."

On May 2, 2019, defendant Traynor was assigned to investigate the events of May 1, 2019. Members of the Portland Police Bureau had visited Cider Riot shortly after the events just discussed, and no alleged Antifa victims were willing to talk them. Upon information and belief, defendants and others conspired to focus investigative resources upon Cider Riot for the purpose of unconstitutionally targeting plaintiffs on the basis of their political beliefs.

Though defendant Traynor did identify at least two victims of criminal conduct by Antifa patrons at the bar, he made no serious effort to identify the perpetrators on the Antifa side, and no one on the Antifa side was ever prosecuted for their attacks on Gibson, Schultz, and others—though the identitities of at least two such attackers were known to Traynor and others. Specifically, Traynor obtained video evidence of one individual kicking Gibson and spitting on Gibson. Dispite learning the identity of that individual, and dispite Traynor having been notified in writing that Gibson wanted charges pursued against that person, Traynor did not arrest that individual or even bother to request charges be filed by the prosecutor's office.

On or about July 8, 2019, defendant Wheeler made further public statements concerning plaintiff Gibson, falsely characterizing him as among a group of people "who have engaged in violence in the streets of this community, [but] they are not in this community". He also falsely

stated that: "He's [Gibson has] publicly stated in the past that he comes here with others who are often committed publicly to committing acts of violence".

On or about July 16, 2019, defendants became aware of a "potential large-scale" protest event called "Stand Against Domestic Terrorism," an organizing purpose of which was to bring attention to Antifa as a group that should be classified as a domestic terrorism concern.

As early as August 2, 2019, it was publicly reported that meetings were occurring among the offices of the Mayor, City Attorney, the District Attorney, and others "to help prepare for the Aug. 17 protests".

On August 5, 2019, defendant Outlaw was quoted in the *Oregonian* concerning the August 17th protest: "Don't come. We don't want you here." At all relevant times, she and the other two Chiefs of Police during the three years plaintiffs faced criminal prosecution were willing participants in the custom, practice, policy and conspiracy alleged herein.

On August 6, 2019, Wheeler told the *Oregonian* that he had been meeting with the office of the District Attorney concerning responses to the August 17th protest. He also announced that on August 14th, he would be "bringing together elected officials, business folks, institution leaders, faith leaders, civil rights leaders and others" for what would later evolve into a political rally viciously and falsely attacking plaintiffs for their political beliefs.
Referring specifically to plaintiffs (though without naming them), he accused them of "choos[ing] to come to our beautiful, our progressive, our vibrant city to engage in acts of violence and vandalism. In other words, they are subverting that right to assembly and free speech for the purpose of committing violence."

When the *Oregonian* reporter questioned Wheeler about a lack of focus on Antifa as the source of violence, Wheeler dismissed the claim an "unsubstantiated narrative" put forth only by "extreme media sources," confirming his powerful identification with Antifa and its objectives, even to the point of overlooking its infamous history of vandalism and violence.

Focusing his ire on those who sought to deem Antifa a terrorist organization, the Mayor said: "The people that I'm concerned about on August 17, as I said, they are subverting, in my opinion, these core American values of the right to assembly and the right to free speech to come to our community, to commit acts of violence and vandalism." While the Mayor claimed that "[v]iolence on our streets is unacceptable regardless of who perpetrates it," subsequent tolerance of mass vandalism and violence by Antifa members, even assaults on police, made it clear that at all relevant times the Mayor has harbored (and acted upon) a powerful animus against plaintiffs and those sharing similar political views that are not welcome in what the Mayor referred to a "progressive community".

Defendants worked together to institute a malicious prosecution of plaintiffs, with defendants Underhill and Kalbaugh issuing a secret indictments (technically, each an "Information of District Attorney") charging them each with a single count of riot based on only their presence at the protest in front of Cider Riot on May 1st.

The secret indictments were dated August 12, 2019. They were prepared, and upon information belief, executed by defendant Kalbaugh on behalf of defendant Underhill.

On August 12, 2019, Kalbaugh signed two "Affidavit in Support of Arrest Warrant" making muliple false or misleading statements against plaintiffs, including but not limited to:

- Plaintiffs were "physically threatening members of the Antifa group"

- Plaintiff Gibson "repeatedly challeng[ed]" members of the Antifa group to fight him

- Plaintiff Gibson was "physically pushing Heather Clark"

At the time that Kalbaugh submitted the affidavit he had full access to, and upon information and belief had viewed, the videos of the events of May 1st, including Gibson's livestream video, and the police reports from members of PPB. Kalbaugh knew that Gibson and Schultz had not engaged in riot at the time he signed and filed that affidavit.

Notwithstanding the repeated accusations by Wheeler and others that plaintiffs were "white supremacists," the Affidavit identifies plaintiff Gibson as an "Asian male".

The malicious charges against plaintiffs were not only in retaliation for past political activity, but it was also perpetuated specifically to chill future political activity by Mr. Schultz, Mr. Gibson, and other conservatives.

Defendants pursued plaintiff Schultz in Case No. 19CR53035 and plaintiff Gibson in case 19CR53042.

The prosecution and arrests of plaintiffs would not have occurred but for the prior (and anticipated future) politicial acivity of Mr. Schultz and Mr. Gibson.

On August 14, 2019, defendant Wheeler held a rally at which he and other speakers attacked plaintiffs and others. Wheeler stated: "So hear me loud and clear. To those of you who plan on using Portland on August 17th as a platform to spread your hate, you are not welcome here." A speaker he invited stated that:

". . . fascist white nationalists have sponsored monthly hate rallies in Portland during the summer since 2017 under the guise of exercising their free speech and assembly rights. . . . Creating false equivalencies between violent white nationalists and those willing to defend our City against their violence is unacceptable. Pandering to a national climate that accuses Portland of being soft on Antifa is unacceptable. There is no equivalence between racist, anti-Semitic, Islamophobic, homophobic violence and those who say no to it. Antifa must not be scapegoated. We are in truth a City that is anti-fascist."

At all relevant times, defendants have never had any evidence that plaintiffs Gibson and/or Schultz had engaged in racist, anti-Semitic, Islamophobic, or homophobic violence.

On Thursday, August 15, 2019, plaintiff Gibson provided defendant Kalbaugh with an extensive sworn statement explaining the events of May 1, 2019 and his role in them, requesting that the evidence be presented to the grand jury. Defendant Kalbaugh responded the next day saying he had reviewed Gibson's sworn statement, but would not be presenting it to the grand jury.

Also on or about Thursday, August 15, 2019, proceedings were held before the Grand Jury in Multnomah County, conducted by defendant Kalbaugh, at which defendant Traynor was the principal witness, though he had no personal knowledge of the events at Cider Riot.

Though under a duty pursuant to ORS 132.320 to present "no other evidence [at a grand jury hearing] than such as might be given on the trial of the person charged with the crime in question," Kalbaugh presented essentially nothing *but* inadmissible evidence concerning plaintiffs to the grand jury. Later, during the criminal proceedings against plaintiffs, defendants Kalbaugh and Hughey did not even oppose motions in limine challenging the "evidence" defendants presented at the grand jury hearing as inadmissible under the evidence rules.

Though the investigation had failed to uncover any evidence showing riotous conduct by plaintiffs Schultz or Gibson (and in fact all evidence proved their innocence), Kalbaugh and Traynor worked together to present testimony to the grand jury that falsely asserted that Det. Traynor had reviewed video evidence that showed plaintiffs personally engaging in acts that were riotous within the meaning of ORS 166.015. Defendant Traynor went so far as to testify to the grand jury that there was "no doubt whatsoever" the video he reviewed showed Mr. Schultz and Mr. Gibson engaging in acts that were violent and tumultuous.

The point cannot be stressed enough, that directly contrary to Det. Traynor's testimony, the video evidence showed the Mr. Gibson and Mr. Schultz DID NOT engage in riot. Mr. Gibson carried a phone recorder with him for the entire event that recorded all of his activity. Numerous others also recorded the event and their video was acquired by defendants before the grand jury hearing. All of the recordings document plaintiff's activity and show they did not riot. Yet, despite having such clear evidence of innocence in their possession, defendants conspired to persecute plaintiffs.

Defendant Kalbaugh chose to show only limited portions of the video of the May 1, 2019, event to the grand jury, forcing the grand jury to rely on the false testimony from Det. Traynor. The grand jury would not have indicted but for the false testimony of defendant Traynor that was proffered by defendant Kalbaugh.

Only three days after defendants manipulated the grand jury, on Sunday, August 18, 2019, Wheeler issued an e-mail to defendants Traynor, Outlaw and others, in which he bragged that the bogus charges against Mr. Schultz and Mr. Gibson "had a chilling effect" on plaintiff's political activity at the August 17th rally and protest.

Defendants sought to obtain, and did, secret warrants for Gibson in advance of the August 17th rally.  Their hope was to use those warrants to arrest him immediately before the rally and remove him from any role in the event.

Plaintiff Schultz was arrested at his home in Washington State and spent five days in jail before he was even arraigned, and during the process a law enforcement agent told him Schultz had been arrested on orders of defendant Wheeler.  Schultz was totally innocent, and all of the above-referenced individuals knew that to be the case when they conspired to have him prosecuted, and continued that conspiracy for three years.

Plaintiffs Gibson and Schultz both spent time in custody as a result of the conspiracy and were subject to restrictions on their liberty for three years.  They suffered reputational damage.

Schultz had received an offer of employment with CBRE in November of 2019.  The offer include a six-figure annual compensation plan for Schultz.  However, when CBRE conducted a background check they learned of the felony riot charge against Schultz and withdrew the offer of employment.

Upon reviewing the criminal case discovery provided by defendants Underhill, Kalbaugh and Hughey, counsel for plaintiffs Gibson and Schultz filed a sworn declaration in the criminal proceedings on October 25, 2019, in support of a demurrer, which testimony confirmed that there was no evidence of any act of plaintiffs that could be considered as "violent and tumultous" for purposes of the riot statute, and it was clear that at all relevant times, plaintiffs were exercising rights of free expression when assaulted by patrons of Cider Riot.

Counsel for plaintiff Gibson also confirmed that there was no evidence that plaintiff Gibson had pushed Heather Clark, and that the record of Ms. Clark's interview by Traynor did not contain any assertion that she had been pushed by Gibson, and indeed confirmed that Traynor understood that Gibson was trying to hold Clark back when Clark attempted to charge through him.  This and other conduct repeatedly put defendants on notice of the lack of any evidence to support criminal prosecutions.

An investigator for the Oregon Liquor Control Commission, not bound by the custom, practice and policy alleged herein, and not a member of the conspiracy, would later highlight her report of the May 1st events at Cider Riot with a picture captioned:  "Picture of victim Heather Clark (PPB Report 19-131483) attacking Joey Gibson".  She recommended that multiple charges be brought against Cider Riot for violations of Commission rules.  Upon information and belief, defendants exercised influence to ensure that did not happen.

And while the above conspirators were expending efforts to persecute plaintiffs Gibson and Schultz for a crime they did not commit, they refused to prosecute those they knew to be guilty of serious crimes simply because those other individuals expressed political viewpoints shared by

defendants.  While violent crime and property crime has skyrocketed in Multnomah County, the conspirators busied themselves prosecuting these two innocent men.[3]

It is abundantly clear that the purpose of the scheme was to make an example of plaintiffs Gibson and Schultz so as to send a message to conservatives that they are not welcome in the Portland area and that if they dare to protest in Multnomah County they will be prosecuted even when it is obvious they are innocent.

As of December 31, 2019, defendant Outlaw, perhaps unable to bear her continuing role in the perversion of Portland law enforcement, resigned as Chief of Police and was replaced by defendant Jami Resch.

On March 6, 2020, Mr. Schultz's initial defense lawyer had a conversation with Deputy defendant Kalbaugh about the case and told him there was no evidence of any violent or tumultuous conduct by plaintiff Schultz and she wanted to know why Schultz had been charged with a crime.  Defendant Kalbaugh did not deny her assertion that there was no evidence against Mr. Schultz, nor did he claim she was wrong, nor did he identify any violent or tumultuous conduct committed by Schultz.  Rather, Kalbaugh admitted that Schultz was being prosecuted simply because he was standing in the location of others at the protest.  On April 21, 2021, counsel for Schultz later executed a Declaration offering testimony concerning these events under oath, which was filed in the criminal action, providing further notice to defendants of the lack of any basis for maintaining criminal prosecutions of plaintiffs.

Also on March 6, 2020, defendant Kalbaugh told the Multnomah County Circuit Court:  " "Your Honor, if the State was charging Mr. Gibson with assault, the State can see that Mr. Gibson would have a very good basis to say, 'How am I being charged with assault? I don't see anything of me assaulting anyone.'"

On June 6, 2020, defendant Wheeler directed defendant Resch to halt the use of tear gas to control Portland riots absent "a serious and immediate threat to life safety," removing one of the few effective tools the Portland Police Bureau had to control Antifa rioting.  Defendant Wheeler also halted use of LRAD (Long Range Accoustic Devices) to disperse crowds.

On or about July 5, 2020, Antifa member, Michael Reinhoehl was arrested for possessing a loaded gun in a public place, resisting arrest, and interfering with police.  By July 30th, the MCDA had dropped all charges.

Reinoehl later murdered Aaron Danielson on August 29, 2020, during other protests.  Danielson was a friend and supporter of plaintiff Gibson, and was wearing a "Patriot Prayer" hat when he was murdered.

---

[3] See https://www.oregonlive.com/crime/2022/08/portland-is-on-pace-for-another-record-year-of-killings-what-continues-to-drive-the-surge.html

A day before Reinoehl murdered Aaron Danielson, Reinoehl attended a conservative rally in Camas, Washington that Gibson had publicly announced he would attend.  Reinoehl was in disguise, stalking Gibson, and was wearing exactly what he would later wear when he murdered Danielson.

Danielson and Gibson had arranged to meet each other in downtown Portland the day of the murder, and in fact Gibson was only a couple of blocks from Danielson, and walking towards the meeting location, when Reinoehl (who was lying in wait) ambushed Danielson and murdered him in a cold blood.

Earlier that month, on August 11, 2020, defendant Schmidt had officially adopted a formal policy ("Policy") presumptively declining to prosecute riot cases under ORS 166.015 when not accompanied by allegations of more serious crimes.  In practice, the Policy formalized a portion of a preexistng custom, practice and policy of defendants to not prosecuting riot and other cases where those that the police had accused of riot were involved in a event related to political activity of which defendants approved.  More specifically, defendant Schmidt would limit prosecutions if the alleged rioter was supporting a liberal cause, but no such limits applied to continued and future prosecution of conservatives.

The Policy adopted by Schmidt was not created by defendant Schmidt himself, but was provided to him in substantially complete form by an out of state group  called "The Wren Collective, LLC," a firm described on its website (wrencollective.com) as "Strategic Advising for Social Change," serving "clients who want to take the bold action needed to radically transform the criminal legal system".

The Wren Collective bragged that it "will show you which levers need to be pulled to obtain radical transformation, and then we help you pull them."

The group was working secretly with defendant Schmidt by mid-June.  In an email from Amy Webber to defendant Schmidt on June 16th, she bragged that the Wren Collective worked with "elected prosecutors all over the country" and did its work in the shadows "without any billing or publicity".

On information and belief, the Wren Collective was paid thousands of dollars for their services by an outside group and the cost of that services was never reported by defendant Schmidt in any campaign disclosure or any other public disclosure.

Schmidt was introduced to the Wren Collective in an email on Jun 11, 2020, from Portland area political supporter of Schimdt, David Menschel.  Menschel used his personal gmail account to make that introduction.

Menschel was a public supporter of Schmidt's 2020 campaign.

On June 21, 2020, Jessica Brand, head of the Wren Collective wrote in an email to Schmidt's private account to schedule a private call so that the substance of their communication would not be documented in writting.

Amy Webber, of the Wren Collective, provided Schmidt a first draft of the Policy on July 24, 2020, at which time it included a provision that there would be no charges filed for the crime of felony riot unless in addition to the rioting by the individual accused of personally rioting there was also "property damage, theft, or the use or threat of force against another person."

She sent that policy in an email to Mike Schmidt's private email account, not a county email account. Webber would also use her personal gmail account on occasion, when communicating with Schmidt, as opposed to her official Wren Collective account.

Also included in the emails with the Wren Collective was Multnomah County District Attorney's Office Policy Director Aaron Knott. Knott also used his personal email accounts for communications with the Wren Collective.

Mike Schmidt then forwarded that draft of the Policy to the private email account for Jeffrey A. Howes, who was, and is, the First Assistant District Attorney for the Multnomah County District Attorney's Office.

Notwithstanding discovery in a federal action discussed below, very little information was produced concerning evolution of the Policy is available beyond defendant Schmidt's limited interactions with the Collective. Defendants in a subsequent federal action never fully complied with discovery obligations, and produced documents confirming the incompleteness of the limited productions they did make. For example, on July 1, 2020, defendant Schmidt wrote an e-mail in which he referred to a "case" and "commitment" presented in a meeting with "local officials" the day before concerning policies for prosecuting protestors, but produced no documents concerning this meeting.

Defendant Schmidt, and upon information and belief other defendants, have a pattern and practice of communicating concerning their illegal custom, practice, policy and conspiracy on personal devices and through personal e-mail and other accounts, so as to avoid the release of materials pursuant to media and other requests under the Oregon Public Records Act.

On August 10, 2020, a Leftist leader, Demetria Hester was arrested while participating in riots involving rioters throwing two-inch rocks, full bottles of water and other projectiles at officers, and using mortars that blew up on officers. Her charges were immediately dismissed in the interests of justice, a pattern that would persist when police managed to arrest those with leadership roles in leading public disorder in Portland.

Counsel for Gibson wrote to Kalbaugh, seeking application of the Policy to Gibson's case, and pointing out that Ms. Hester's role, like that of Gibson, was that of a speaker.

Kalbaugh, after meeting with Schmidt, insisted (contrary to fact) that the Policy was not intended to be retroactive and would not be applied to Gibson (or Schultz). Kalbaugh refused to allow counsel for Gibson to attend his meeting with Schmidt, so as to answer questions, show relevant portions of the videos, and otherwise establish Gibson's innocence.

Despite claims of Kalbaugh and Schmidt to the contrary, the Policy was in fact applied retroactively to all other protest cases except plaintiffs. That is to say *all* other previously filed stand-alone riot cases that had previously been charged were dismissed.

On or about August 13, 2020, Schmidt told the *Washington Post* that the new policy would be retroactive for hundreds of people arrested in riots relating to protests over the death of George Floyd.

On August 23, 2020, faced with a *New York Times* reporter questioning his decision to dismiss hundreds of criminal charges arising from Antifa-related protests occurring since May 2020, defendant Schmidt said: "At a time when legitimacy in our criminal justice system is probably at an all-time low, we can't be seen as using that very system to silence the speech that is being critical of it." Defendant Schmidt nonetheless told the *New York Times* that the cases of Gibson (and thus Schultz) merited prosecution.

On August 29, 2020, faced with a pro-Trump political rally in the form of a car caravan intending to drive through downtown Portland, defendant Wheeler and defendant Lovell blocked freeway ramps in an attempt to keep conservatives out of the downtown area and restrain their political activity based on the viewpoint expressed by that activity. A persistent pattern has emerged of defendants Wheeler and other Portland authorities permitting Antifa members to blockade streets (and even I-84), while defendants themselves blocked streets to prevent conservative protestors such as Schultz and Gibson from participating in events in Portland.

On September 9, 2020, defendant Wheeler introduced and procured passage of an ordinance, No. 190113, to bar the Portland Police Bureau and other City offices from utilizing facial recognition systems which Antifa and its political allies feared could result in their arrests. As a general matter, defendants failed to take reasonable efforts to identify Antifa suspects in the ongoing riots of 2019, 2020, 2021, and 2022, and even where police captured them rioting on multiple occasions, failed to follow through with criminal prosecutions.

On September 21, 2020, the United States Department of Justice issued findings that Portland was one of three jurisdictions "that have permitted violence and destruction of property to persist and have refused to undertake reasonable measures to counteract criminal activities," even though "Portland [had] marked 100 consecutive nights of protests marred by vandalism, chaos, and even killing".

Notwithstanding a target-rich environment of Antifa rioters attacking police and destroying property, defendants continued to prosecute Schultz and Gibson for their prescient efforts to draw attention to the dangers presented by Antifa, while dismissing nearly all cases against Antifa protestors.

On September 22, 2020, shots were fired near a demonstration outside the Multnomah County Sheriff's Office at 4735 E. Burnside Street by Antifa elements, sending two people to the hospital. The Portland Police Bureau announced that the gunfire in a residential community posed "no threat to the community" and, upon information and belief, made no arrests.

On September 23, 2020, defendant Wheeler continued his public tirades against plaintiffs and other right of center political protestors, warning that on September 26th, "alt-right groups and white nationalists are intent on coming into our community. These groups empower racism, intolerance and hate. Those are not Portland values, and they are not welcome. Hate has no home in Portland." Through a public statement, on September 25th, defendant Wheeler admitted that "Portland has a long history of opposing far-right organizing," confirming the ongoing custom, practice, policy and conspiracy to misuse governmental power to deny conservatives their fundamental constitutional rights in Portland.

Though defendant Wheeler had banned the use of tear gas against Antifa, defendant Wheeler made a special exception for its use in connection with the September 26th conservative gathering.

In the meantime, on September 11, 2020, plaintiffs Schultz and Gibson commenced an action in federal district seeking to enjoin their felony prosecutions as an unconstitutional exercise of selective and retaliatory prosecution by defendants Schmidt, MCDA and Kalbaugh.

A detailed examination of MCDA's charging decisions that resulted from the discovery obtained by plaintiffs in the federal case showed a consistent pattern of excusing extreme and violent conduct by Antifa members, while pursuing serious charges against their political opponents in similar circumstances (or less egregious conduct by the political opponents).

Discovery in the federal case also confirmed that defendant Schmidt had applied the policy retroactively to *all* cases that had been charged prior to the institution of the policy, with the exception of the single consolidated case against Schultz, Gibson and one other co-defendant. No riot cases factually similar to those of Schultz and Gibson were charged by defendants; and all of the riot cases that were charged against Antifa defendants involved at least one crime in addition to riot.

The discovery also revealed numerous charging decisions by defendant Kalbaugh in which he personally articulated an entirely different view of the law than he was advocating in the prosecutions of Schultz and Gibson. Explaining to a Portland police officer why he would not prosecute one Antifa rioter, Kalbaugh said: "Mere proximity to people rioting does not satisfy the legal requirement of 'engaging in tumultuous and violent conduct'".

The federal judge concluded, in an Opinion and Order issued February 26, 2021, that "Plaintiffs make compelling arguments that their conduct does not rise to the level of 'tumultuous and violent' conduct under O.R.S. 166.015."

However, the Court was unable to take jurisdiction over the criminal prosecution due to the federal doctrine known as "*Younger* abstention." (Slip op at 18.) Accordingly, the federal court was compelled to abstain from evaluating the merits of plaintiffs' selective prosecution claim and dismissed the action without prejudice, making it clear that "this Court is not opining on the ultimate validity of their selective prosecution claim". (*Id.* at 23.)

When concluding that the court was barred from accepting jurisdiction due to the *Younger* abstention doctrine, the federal judge had relied upon the false declarations executed by defendant Kalbaugh back on August 12, 2019 to conclude that detectives observed video of defendants "taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation". (Slip op. at 5).

On or about October 23, 2020, Kalbaugh told the Multnomah County Circuit Court that he understood that riotous conduct involved what he characterized as "terrorist mob behavior involving ominous threats of personal injury and property damage," yet defendants continued to pursue the prosecution of these two innocent men despite having no evidence of such activity.

On July 23, 2021, the Multnomah County Circuit Court denied a motion filed by plaintiffs to dismiss the criminal proceedings for selective prosecution. The Court ruling relied on on the false representation by defendants Kalbaugh and Hughey that the no riot prosecution Policy was not retroactively applied and was "only ever intended to be forward looking". (Order at 5 n.3.)

The Court did, however, write that after review of video evidence it appeared to the Court that *none* of the evidence presented on the motion—evidence "that appears to capture the entirety of the event giving rise to the filed charges" (*id.* at 3)—showed defendants Schultz or Gibson "engaging in [affirmatively violent physical] behavior". (*Id.* at 5 n.4.) In Oregon State criminal court (unlike in other states), the trial court is not authorized to dismiss a prosecution for lack of evidence as a matter of law until after the State has rested its case in chief during the actual trial.

At the trial. the prosecution, led by Kalbaugh, called multiple eye witnesses to the May 1, 2019 protest. Yet not one of them, including Heather Clark, testified that either Schultz or Gibson did anything that day that was violent or tumultuous. Heather Clark described Gibson's conduct that day to be mostly walking around, talking, and livestreaming. None of the witnesses testifed to any physical conduct of Gibson or Schultz that was not already on the videos that the defendants had in their possession for the over three years that they persecuted plaintiffs without evidence.

July 19, 2022, when the prosecution rested its case during the trial was the very first legal opportunity for the the Multnomah County Circuit Court to rule on plaintiff's motion to dismiss. The court, having reviewed the video evidence and heard all of the witness testimony granted plaintiffs' motion for acquittal at the close of the State's case, finding that there was no evidence of riotous conduct by Schultz or Gibson. The Judge remarked that: "The state is trying to convict Mr. Schultz for being present at an incident that violence occured, and they cannot do so. I am somewhat bewildered that the State has driven the case to this point. As an institution, the district attorney's office's decision to push this case to trial is surprising, given the state of the evidence."

As the Judge explained, "If the defendant could be convicted of riot in this case, there would be no protection for protesters in Oregon. If being there and using your body to take up space is sufficient, then any protester runs the risk of arrest if it turns out that tumult ensues."

As a result of the Judge's ruling, the ultimate question of selective prosecution, which the Court had reserved for a possible evidentiary hearing on a motion for arrest of judgment was never reached. Plaintiffs will prove in this case that they were the victims of selective and malicious prosecution in retaliation for political activity and to chill future political acivity, as well as other tortious conduct by defendants in litigation of the claims presented herein.

### Tort and Other Claims

The tortious conduct continued for three years and constituted a conspiracy to violate the civil rights of plaintiffs Schultz and Gibson and conservatives generally, with numerous overt acts as pleaded above constituting malicious prosecution, retaliation, the intentional infliction emotional distress, defamation and other intentional torts. Mr. Gibson and Schultz collectively seek $100,000,000 in damages for their lost earning capacity, reputational harm and other categories of damage.

### Preservation of Evidence

You and your employees, agents, officers, or attorneys (hereinafter collectively "you" or "your") are hereby given notice to immediately take all steps necessary to prevent the destruction, loss, concealment, or alteration of any paper, document, or electronically stored information ("ESI") and other data or information generated by and/or stored on its computers and storage media (e.g., hard disks, floppy disks, backup tapes, etc.), online chat transcripts, call recordings, phone logs, call logs, account notes, calendaring systems, statements, information stored on your servers, computers, smart phones, tablets or other electronic devices and e-mail related to the claims above. This includes but is not limited to material previously sought by subpoena to the Portland Police Bureau and the Office of the Mayor in Case No. 19CR53042, except at the relevant period for preservation of evidence extends from January 1, 2017 to the present.

You should anticipate that much of the information subject to disclosure and responsive to discovery associated with the foregoing claims is stored on your current or former computer systems and other media and devices (including personal digital or data assistants, voice-messaging or voice-mail systems, online repositories, and cell phones). This would include items on the personal computers and telephones of your employees who may be utilizing such equipment to conduct business, particularly at home during the COVID epidemic.

ESI should be afforded the broadest possible definition and includes, but is not limited to, all digital communications (e.g., e-mail, voice mail, instant messaging), word processed documents (e.g. Word and WordPerfect documents and drafts), spreadsheets and tables (e.g. Excel and Lotus 123 worksheets), accounting application data (such as QuickBooks, Money, or Peachtree), billing or accounting software, image and facsimile files (including PDF, TIFF, JPG, and GIF images), Facebook or other social media posts and chats, sound recordings (including

WAV and MP3 files), video recordings, all databases, all contact and relationship management data, calendar and diary application data, online access data (including temporary, internet files, History, and Cookies), all presentations (including PowerPoint and Corel), all network access and server activity logs, all data created with the use of any Personal Data Assistant (PDA) such as Palm Pilot, HP Jornada, Cassiopeia, or other Windows-based or Pocket PC devices, all CAD files, and all back- up and archival files.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques to safeguard all such evidence.  Because hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for ESI. If information exists in both electronic and paper form, you should preserve them both.

### Litigation Hold

You are requested to immediately initiate a litigation hold for potentially relevant ESI, documents, and tangible things, and to act diligently and in good faith to secure and audit compliance with that litigation hold. You are also requested to preserve and not destroy all passwords, decryption procedures (including, if necessary, the software to decrypt the files), network access codes, ID names, manuals, tutorials, written instructions, decompression or reconstruction software, and any and all other information and things necessary to access, view, and (if necessary) reconstruct any ESI. You should not pack, compress, purge, or dispose of any file or any part thereof.

You are further requested to immediately identify and modify or suspend features of your operations, information systems, and devices that, in routine operations, operate to cause the loss of documents, tangible items, or ESI. Examples of such features and operations include, but are not limited to, purging the contents of e-mail repositories by age, capacity, or other criteria; using data or media wiping, disposal, erasure, or encryption utilities or devices; overwriting, erasing, destroying, or discarding back-up media; re-assigning, re-imaging or disposing of systems, servers, devices, or media; running antivirus or other programs that alter metadata; using metadata stripper utilities; and destroying documents or any ESI by age or other criteria.

### Servers and Storage

With respect to servers like those used to manage electronic mail and network storage, the entire contents of each user's network share and e-mail account should be preserved and not modified.

With respect to on-line storage and/or direct access storage devices attached to your mainframe computers and/or minicomputers, in addition to the above, you are not to modify or delete any ESI, "deleted" files, and/or file fragments existing on the date of this letter's delivery that contain potentially relevant information.

With regard to all electronic media used for off-line storage, including magnetic tapes and cartridges, optical media, electronic media, and other media or combinations of media containing potentially relevant information, you are requested to stop any activity which may result in the loss of any ESI, including rotation, destruction, overwriting and erasure in whole or in part. This request is intended to cover all media used for data or information storage in connection with your computer systems, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes, and all other media, whether used with personal computers, minicomputers, mainframes or other computers, and whether containing backup and/or archival ESI.

### Personal and Portable Computers and Systems

As discussed above, the defendants herein appear to have a pattern and practice of utilizing personal devices and accounts with respect to information relevant to these claims. You should take immediate steps to preserve all ESI on all personal computers, cell phones and social media accounts used by your employees and agents, that in any way relate to the claims asserted above. As to fixed devices, (1) a true and correct copy is to be made of all such ESI, including all active files and completely restored versions of all deleted electronic files and file fragments; (2) full directory listings {including hidden files) for all directories and subdirectories (including hidden directories) on such fixed devices should be written; and (3) all such copies and listings are to be preserved until this litigation is ended. As to floppy diskettes, CDs, tapes, and other non-fixed media relating to this matter, they are to be collected and stored pending resolution of this litigation.

In addition to your immediate preservation of ESI, documents and tangible items on your servers and workstations, you should also determine if any home or portable systems may contain potentially relevant data or information. To the extent that you or your employees or agents have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from his computers or systems, you must preserve the contents of systems, devices, and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R discs, PDAs, smart phones, voice mailboxes, or other forms of ESI storage). Additionally, if any of your agents or employees used online or browser-based e-mail accounts or services to send or receive potentially relevant messages and attachments, the contents of these account mailboxes should be preserved.

### Evidence Created or Acquired in the Future

With regard to documents, tangible things, and ESI that are created or come into your custody, possession, or control subsequent to the date of delivery of this letter, potentially relevant evidence is to be preserved. You should take all appropriate action to avoid destruction of potentially relevant evidence.

Please forward a copy of this letter to all of your employees, agents, officers, or attorneys possessing or controlling potentially relevant evidence. Your obligation to preserve potentially relevant evidence is required by law.

Thank you for your attention to this matter.

Respectfully submitted,

D. Angus Lee
Counsel for Mr. Schultz and Mr. Gibson

# RESOLUTION No.3 7 4 1 4

The City of Portland condemns white supremacist and alt-right hate groups
(Resolution)

WHEREAS, nationally, there has been a rise of white nationalist, white supremacist and
alt-right hate groups, many of which have been emboldened by the words and actions
of the current presidential administration; and

WHEREAS, *The New York Times* has cited Eric Kaufmann, a professor at
Birkbeck University in London who studies how ethnicity intersects with politics, as
providing the following definition of white nationalism: the belief that national identity
should be built around white ethnicity, and that white people should therefore maintain
both a demographic majority and dominance of the nation's culture and public life; and

WHEREAS, like white supremacy, white nationalism places the interests of white
people over those of other racial groups, and is an ideology focused on maintaining
white political and economic, as well as demographic, dominance and it is at odds with
our commitment to inclusion and multiracial democracy in Portland, Oregon; and

WHEREAS, the Oregon Constitution states, "No law shall be passed restraining the free
expression of opinion, or restricting the right to speak, write, or print freely on any
subject whatever; *but every person shall be responsible for the abuse of this right*"
(emphasis added); and

WHEREAS, while free speech is a core principle of American democracy, the agenda of
white supremacist and alt-right hate groups seeks to destabilize American democracy,
use fear as a control tactic, divide our community, and promote and ignite social
animosities; and

WHEREAS, the State of Oregon has a racist governing history including entering the
Union as a "whites-only" state," refusal to ratify the 14th and 15th amendment to the
United States Constitution, and enacting black exclusion laws; and

WHEREAS, white supremacy groups called for the deportation of Japanese-Americans
following Pearl Harbor, leading to government action that resulted in the forced
relocation of Japanese-Americans to incarceration camps with deplorable living
conditions; and

WHEREAS, the City of Portland has a racist governing history that has created
disparities due to redlining, the displacement of black communities through the
construction of Interstate 5 and other projects, the failure to protect and preserve
Vanport, and a history of bias in government services, including policing, all of which
have led to the gentrification and decimation of historically black neighborhoods; and

WHEREAS, Portland has a documented history of white supremacist hate groups who
have used intimidation and have committed violent repression of individuals in our
community; and

WHEREAS, there has been a recent surge of alt-right hate group activity and hostility, here, in our home, conjuring painful memories of our City's past and causing harm to current residents; and

WHEREAS, the trauma inflicted on people of color by white supremacists and alt-right hate groups results in post-traumatic stress disorder and other psychological harm affecting educational, economic, and social outcomes; and

WHEREAS, Portland is proud to be a Welcoming City, a Sanctuary City, and an Inclusive City for all; and

WHEREAS, our values are rooted in peace, respect, inclusivity and equity, and we derive our strength from our diversity; and

WHEREAS, the City of Portland now celebrates and embraces our community, which includes people of all races, national origins, immigration or refugee statuses, heritages, cultures, religions, sexes, gender identities, gender expressions, sexual orientations, abilities, ages, and economic statuses; and

WHEREAS, the City of Portland condemns hate groups, xenophobia, racism, white supremacy, anti-Semitism, Islamophobia, homophobia, ableism, sexism, and other forms of bigotry; and

WHEREAS, the City of Portland is committed to undoing and eradicating the effects of past systemically racist practices from City Government and all organizations contracted or affiliated with the City of Portland; and

WHEREAS, the City of Portland is proud to stand united against those who propagate hate and incite fear and violence in our community.

NOW, THEREFORE, BE IT RESOLVED that the City of Portland will not tolerate hate in any form and reaffirms its commitment to continue, in collaboration with Portlanders, pursuing policies and directing bureaus in the next year and beyond to ensure civil and human rights to all individuals.

BE IT FURTHER RESOLVED that the City of Portland will work with community organizations to develop a training for all City staff on the history and impact of white supremacy, and how to identify white supremacy.

Adopted by the Council:     FEB 0 6 2019

Mayor Ted Wheeler
Commissioners Fish, Fritz, Hardesty and Eudaly
Prepared by: Nicole A. Grant, Asena Lawrence
Date Prepared: January 28, 2019

**Mary Hull Caballero**
Auditor of the City of Portland
By
Deputy

Exhibit 2, pg. 2 of 3

Agenda No.

**RESOLUTION NO.** 3 7 4 1 4
Title

The City of Portland Condemns White Supremacist and Alt-Right Hate Groups (Resolution)

| INTRODUCED BY<br>Commissioner/Auditor:<br>**Ted Wheeler, Chloe Eudaly,<br>Nick Fish, Amanda Fritz,<br>Jo Ann Hardesty** | CLERK USE: DATE FILED ___JAN 29 2019___ |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero<br>Auditor of the City of Portland |
| Mayor—Finance & Administration – Wheeler | |
| Position 1/Utilities - Fritz | By: _____ |
| Position 2/Works - Fish | Deputy |
| Position 3/Affairs - Hardesty | |
| Position 4/Safety - Eudaly | **ACTION TAKEN:** |
| **BUREAU APPROVAL** | |
| Bureau: Office of the Mayor<br>Bureau Head: Mayor Ted Wheeler | |
| Prepared by: Nicole A. Grant<br>Date Prepared:1/28/2019 | |
| Impact Statement<br>Completed  ☒     Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated<br>in document.<br>Yes ☐    No ☒ | |
| **City Auditor Office Approval:**<br>required for Code Ordinances | |
| **City Attorney Approval:**<br>required for contract, code, easement,<br>franchise, charter, Comp Plan | |
| Council Meeting Date     **2/7/2019** | |

| AGENDA | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|---|
| **TIME CERTAIN** ☒<br>**Start time: 2:00PM** | | | YEAS | NAYS |
| **Total amount of time needed: 75 minutes**<br>(for presentation, testimony and discussion) | 1. Fritz | 1. Fritz | ✓ | |
| | 2. Fish | 2. Fish | ✓ | |
| **CONSENT** ☐ | 3. Hardesty | 3. Hardesty | ✓ | |
| **REGULAR** ☐ | 4. Eudaly | 4. Eudaly | ✓ | |
| **Total amount of time needed: _____**<br>(for presentation, testimony and discussion) | Wheeler | Wheeler | ✓ | |

Exhibit 2, pg. 3 of 3

Verified Correct Copy of Original 9/4/2019

## In the Circuit Court of the State of Oregon
## for Multnomah County

19CR53042

|  |  |
|---|---|
| STATE OF OREGON, | Court Nbr ***<br>DA Case  2407866-1<br>Crime Report  PP 19-141483<br>PP 19-143459<br>PP 19-141889<br>PP 19-680568 |
| Plaintiff, |  |
| v. | AFFIDAVIT IN SUPPORT<br>OF ARREST WARRANT FOR VIOLATION<br>OF:   ORS 166.015 |
| JOSEPH OWAN GIBSON |  |
| Defendant. |  |

**FILED**

AUG 1 2 2019

Circuit Courts
Multnomah County, Oregon

I, Brad Kalbaugh, having been first duly sworn, depose and say that the accompanying accusatory instrument is based upon the information set forth below, which is true as I verily believe. That I am employed as a Deputy District Attorney for Multnomah County, Oregon. That in the course of my duties, I have learned or have been told the following concerning the investigation of criminal acts in Multnomah County, Oregon, committed by JOSEPH OWAN GIBSON. That on the evening of 5/1/19, police received numerous calls regarding a crowd of people fighting outside of a business called "Cider Riot". Earlier that day, there had been demonstrations and mass protests in various locations in the city. Demonstrators included, but were not limited to, individuals associated with "Patriot Prayer" and "Antifa" which are political groups that are hostile toward one another and have a history of violence. PPB Sergeant Jerry Cioeta had been monitoring the situation for a good part of the day in plain clothes and had overheard a group of men associated with Patriot Prayer express a desire to get into a physical fight with the Antifa group. When Sgt. Cioeta heard the calls, he immediately responded and observed approximately 15 members of the Patriot Prayer group verbally arguing with approximately 50 members of the Antifa group contained within the outdoor seating area for Cider Riot. Many of the people at Cider Riot were wearing masks and hoods. As the situation escalated, people from both groups deployed pepper spray and started throwing projectiles at one another. Eventually, a woman associated with the Antifa group and later identified as Heather Clark was knocked unconscious by a member of Patriot Prayer who was wielding a baton and later identified as Ian Kramer. A number of different people recorded the incident on video from multiple angles and perspectives. PPB Detective Christopher Traynor investigated the incident after the fact and viewed numerous video clips of the incident that were readily obtainable on the internet via

Verified Correct Copy of Original 9/4/2019.

numerous sources. In the video recordings, Detective Traynor identified Joseph Gibson, Russell Schultz, Mackenzie Lewis, Matthew Cooper, Ian Kramer, and Christopher Ponte, all of whom are associated with the Patriot Prayer contingency. In the video footage, Detective Traynor clearly observed all six of the above named individuals taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation. Video observed by Detective Traynor shows Gibson repeatedly challenging members of the Antifa group to fight him as he says "do something" and taunts them from a sidewalk. Video observed by Detective Traynor shows Gibson physically pushing Heather Clark, the woman who eventually was knocked unconscious by Ian Kramer. Video observed by Detective Traynor shows Gibson, Schultz, and others in a circle around two people engaged in a fist fight, one from each opposing group. Video observed by Detective Traynor shows Christopher Ponte discharge pepper spray or mace at the crowd of Antifa supporters. Video observed by Detectie Traynor shows Christopher Ponte throwing a projectile into the crowd of Antifa supporters and patrons. Detective Traynor interviewed Crystal Pritchett who explained that she had been physically injured after having been struck by a projectile that had been thrown by one of the Patriot Prayer people. Pritchett provided Detective Traynor with photographs of her injuries. Through careful review of the numerous videos taken from different perspectives and by utilizing points of comparison from one video to another, Detective Traynor was able to conclude that the projectile thrown by Christopher Ponte is the rock that struck Crystal Pritchett. Video observed by Detective Traynor shows Matthew Cooper physically attacking members of the Antifa group, throwing objects at them, and attempting to provoke a fight. Video observed by Detective Traynor shows Mackenzie Lewis physically taunting members of the Antifa group in an effort to provoke a fight.

That the police report(s) from this incident and other computerized criminal records identify the defendant as JOSEPH OWAN GIBSON, a Asian male, 11/08/1983, 6 ft 01 in, 235 lbs, with a last known address of 12001 NE 96TH Avenue, Vancouver, Washington, 98662.

That based upon the foregoing information, I have probable cause to believe that JOSEPH OWAN GIBSON has committed the crime(s) of: COUNT 1 - RIOT. I move the Court on the within information that a warrant be issued for the apprehension of said defendant.

Date  8/12/19                                     _____
                                                  Brad Kalbaugh, Affiant, OSB# 074335

SUBSCRIBED AND SWORN TO before me this 12th day of August, 2019.

_____
Notary Public for Oregon → Circuit Court Judge
My Commission Expires: _____

# In the Circuit Court of the State of Oregon
## for Multnomah County

19CR53035

STATE OF OREGON,

Court Nbr     ***
DA Case     2407870-1
Crime Report     PP 19-141483
               PP 19-143459
               PP 19-141889
               PP 19-680568

Plaintiff,

v.

RUSSELL E SCHULTZ

AFFIDAVIT IN SUPPORT
OF ARREST WARRANT FOR VIOLATION
OF:    ORS 166.015

FILED
AUG 1 2 2019
Circuit Courts
Multnomah County, Oregon

Defendant.

I, Brad Kalbaugh, having been first duly sworn, depose and say that the accompanying accusatory instrument is based upon the information set forth below, which is true as I verily believe. That I am employed as a Deputy District Attorney for Multnomah County, Oregon. That in the course of my duties, I have learned or have been told the following concerning the investigation of criminal acts in Multnomah County, Oregon, committed by RUSSELL E SCHULTZ.

That On the evening of 5/1/19, police received numerous calls regarding a crowd of people fighting outside of a business called "Cider Riot". Earlier that day, there had been demonstrations and mass protests in various locations in the city. Demonstrators included, but were not limited to, individuals associated with "Patriot Prayer" and "Antifa" which are political groups that are hostile toward one another and have a history of violence. PPB Sergeant Jerry Cioeta had been monitoring the situation for a good part of the day in plain clothes and had overheard a group of men associated with Patriot Prayer express a desire to get into a physical fight with the Antifa group. When Sgt. Cioeta heard the calls, he immediately responded and observed approximately 15 members of the Patriot Prayer group verbally arguing with approximately 50 members of the Antifa group contained within the outdoor seating area for Cider Riot. Many of the people at Cider Riot were wearing masks and hoods. As the situation escalated, people from both groups deployed pepper spray and started throwing projectiles at one another. Eventually, a woman associated with the Antifa group and later identified as Heather Clark was knocked unconscious by a member of Patriot Prayer who was wielding a baton and later identified as Ian Kramer. A number of different people recorded the incident on video from multiple angles and perspectives. PPB Detective Christopher Traynor investigated the incident after the fact and viewed numerous video clips of the incident that were readily obtainable on the

Verified Correct Copy of Original 9/4/2019.

Verified Correct Copy of Original 9/4/2019.

internet via numerous sources. In the video recordings, Detective Traynor identified Joseph Gibson, Russell Schultz, Mackenzie Lewis, Matthew Cooper, Ian Kramer, and Christopher Ponte, all of whom are associated with the Patriot Prayer contingency. In the video footage, Detective Traynor clearly observed all six of the above named individuals taunting and physically threatening members of the Antifa group in an effort clearly designed to provoke a physical altercation. Video observed by Detective Traynor shows Gibson repeatedly challenging members of the Antifa group to fight him as he says "do something" and taunts them from a sidewalk. Video observed by Detective Traynor shows Gibson physically pushing Heather Clark, the woman who eventually was knocked unconscious by Ian Kramer. Video observed by Detective Traynor shows Gibson, Schultz, and others in a circle around two people engaged in a fist fight, one from each opposing group. Video observed by Detective Traynor shows Christopher Ponte discharge pepper spray or mace at the crowd of Antifa supporters. Video observed by Detective Traynor shows Christopher Ponte throwing a projectile into the crowd of Antifa supporters and patrons. Detective Traynor interviewed Crystal Pritchett who explained that she had been physically injured after having been struck by a projectile that had been thrown by one of the Patriot Prayer people. Pritchett provided Detective Traynor with photographs of her injuries. Through careful review of the numerous videos taken from different perspectives and by utilizing points of comparison from one video to another, Detective Traynor was able to conclude that the projectile thrown by Christopher Ponte is the rock that struck Crystal Pritchett. Video observed by Detective Traynor shows Matthew Cooper physically attacking members of the Antifa group, throwing objects at them, and attempting to provoke a fight. Video observed by Detective Traynor shows Mackenzie Lewis physically taunting members of the Antifa group in an effort to provoke a fight.

That the police report(s) from this incident and other computerized criminal records identify the defendant as RUSSELL E SCHULTZ, a white male, 07/26/1969, 5 ft 10 in, 155 lbs, with a last known address of 3001 NE 141st Avenue, Vancouver, Washington, 98682.

That based upon the foregoing information, I have probable cause to believe that RUSSELL E SCHULTZ has committed the crime(s) of: COUNT 1 - RIOT. I move the Court on the within information that a warrant be issued for the apprehension of said defendant.

Date____8/12/19____

Brad Kalbaugh, Affiant, OSB# 074335

SUBSCRIBED AND SWORN TO before me this __12th__ day of __August__, __2019__.

Notary Public for Oregon   Circuit Court Judge
My Commission Expires:_____

000001

**From:**          Wheeler, Mayor
**Subject:**      Exceptional Work
**To:**              AllPPBUsers
**Sent:**          August 18, 2019 8:22 PM (UTC+00:00)

All Portland Police Bureau members,

In light of the recent mass shootings around the country, we were preparing for the worst on August 17th.
Thankfully the worst did not happen – and that is in large part because of every single one of you.

You all did an exemplary job managing the demonstration.

So did our partners.

Regional and federal law enforcement partners took action prior to the event that also reduced violence the day of the demonstration. For example, the Multnomah County District Attorney's Office indicted 5 people in the post Mayday Cider Riot incident that I believe had a chilling effect.

Chief Outlaw and her communications team were on *top of it* – and were *very* proactive with their public messaging prior to the demonstration.
The Chief's message was clear, if you are coming to engage in criminal violence *you are not welcome here and we are ready for you.*

So thank you for all your hard work prior to and during the demonstration. I know days off were canceled and *many of you and your families* made sacrifices.

You protected our city, our home, and people's rights.

I want you to know I have never been more proud.

Sincerely,

> **Mayor Ted Wheeler**
> Pronouns: He/Him/His
> 1221 SW Fourth Avenue, Suite 340
> Portland, OR 97204
> https://www.portlandoregon.gov/wheeler/
> twitter | facebook | instagram

The City of Portland is committed to providing meaningful access. To request translation, interpretation, modifications, accommodations, or other auxiliary aids or services, contact 503-823-1125, Relay: 711.

(503) 823-1125: 口笔译服务| Chiaku me Awewen Kapas | ■■■■■■■ ■■■
■■■■■■■ |Устный и письменный перевод | Turjumaad iyo Fasiraad | Traducción e Interpretación | Письмовий і усний переклад | Biên Dịch và Thông Dịch |

Exhibit 4, pg. 1 of 1

HON. DAVID REES

IN THE CIRCUIT COURT FOR THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

| | | |
|---|---|---|
| STATE OF OREGON,<br><br>PLAINTIFF,<br><br>vs.<br><br>JOSEPH GIBSON,<br><br>DEFENDANT. | | No. 19CR53042<br><br>JOSEPH GIBSON'S<br>DEMURRER |

DEMURRER

1      COMES NOW Joseph "Joey" Gibson, the defendant, by and through the Angus Lee Law

2      Firm, PLLC, and submits this demurrer under ORS 135.610, ORS 135.630(4) & (6), and *State v.*

3

4      *McKenzie*, 307 Or 554, 560, 771 P2d 264 (1989), as the accusatory instrument is "is not definite

5      and certain", and is unconstitutional vague as applied in this case and therefore the facts alleged in

6      an indictment under such a statute do not and cannot constitute an offense.

7      The lack of definitiveness, vagueness, and the uncertainty in the charging document,

8      violates Mr. Gibson's Right to Due Process.

9      PROCEDURE

10      A demurrer is either "allowed" or "disallowed" by the court. ORS 135.660. If a demurrer

11      is disallowed the defendant must enter a plea. ORS 135.700. A demurrer that is allowed is a final

12      judgment on that particular accusatory instrument.

JOSEPH GIBSON'S DEMURRER
No. 19CR53042
Wednesday, August 28, 2019

1

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 1 of 8

CHARGE

In this case Mr. Gibson is charged with Riot under ORS 166.015, for standing on a public sidewalk during a protest event on May 1, 2019.

ARGUMENT

"Generally, an accusatory instrument is sufficient if it describes the offense in the words of the statute." *State v. Caffee*, 116 Or App 23, 25, 840 P2d 720 (1992), *rev den*, 315 Or 312 (1993).  However,

> If the accusatory instrument charges a crime implicating the First Amendment to
> the United States Constitution or Article I, section 8, of the Oregon Constitution,
> **greater specificity may be required**.

1 *Criminal Law* 8.51 (OSB Legal Pubs 2013) (emphasis added); *citing State v. McNamara*, 547 P.2d 598, 274 Or. 565 (Or., 1976) (Because a defendant would not know what actions were criminal and which were not, one could not take the risk of engaging protected expression for fear of prosecution, which could have a "chilling effect on freedom of expression render[ing] the verdict vulnerable to attack on constitutional grounds"); *see also Ankeny v. Lockheed Missiles & Space Co*., 88 Cal.App.3d 531, 537 (1979) (A pleading must "allege facts and not conclusions," and any "allegations of material facts which are left to surmise are subject to special demurrer for uncertainty.")

Here, the charge clearly implicates the First Amendment to the United States Constitution and Art. I, sec. 8, of the Oregon Constitution, thus greater specificity is required in the accusatory instrument.

*A.  Uncertainty and vagueness.*

The charging document is not definite or certain, and is unconstitutionally vague as applied, and is therefore unconstitutionally insufficient as applied to Mr. Gibson in this case, and serves to

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

2

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 2 of 8

1    deprive Mr. Gibson of Due Process and his rights under the First Amendment to the United States

2    Constitution and Art. I, sec. 8 of the Oregon Constitution. ORS 135.610, ORS 135.630(4) & (6),

3    and *State v. McKenzie*, 307 Or 554, 560, 771 P2d 264 (1989) (a vagueness challenge falls within

4    ORS 135.630(4) because, if a statute is vague, "the facts alleged in an indictment under such a

5    statute do not and cannot constitute an offense").

6        Publicly available video of the May 1, 2019, event shows every minute of Mr. Gibson's

7    involvement in the protest. [1]   The video is completely devoid of any act of "violence" of

8    "tumultuous conduct" committed by Mr. Gibson personally.

9        The Oregon Supreme Court wrote plainly in *State v. Chakerian* that "[i]t is clear under the

10   statute that a person does not commit the crime of riot if he or she merely is part of a group and

11   five *other* members of that group engage in tumultuous and violent conduct that intentionally or

12   recklessly creates a grave risk of causing public alarm." 325 Ore. 370, 375 n 8 (1997) (emphasis

13   original). "Under the statute, the state must prove that the person charged actually 'engage[d] in

14   violent and tumultuous conduct.'" *Id.*

15       The *Chakerian* court went on to "note that 'conduct' itself may be protected expression

16   under Article I, section 8." *Id*. n 9. "Artistic conduct, such as dance, *and political conduct*, such

17   as the carrying of protest signs, are just two of the more obvious forms of conduct that also are

18   protected expression under Article I, section 8." *Id*. (emphasis added).

19       How is Mr. Gibson, or any other person, to know what is "tumultuous" under the statue

20   where his speech and presence was protected under the First Amendment to the United States

21   Constitution and Art. I, sec. 8 of the Oregon Constitution?

---

[1] https://youtu.be/HzId89utLys?t=1142

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

3

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 3 of 8

As the video of the protest shows a clear lack of any act of "violence" or "tumultuous conduct" committed by Mr. Gibson personally, both of which are required for a riot charge to stand, the charging document is insufficiently definitive or certain enough to give Mr. Gibson meaningful notice of what he is actually accused of having done.  Accordingly, the demurrer should be allowed by this court.

B.  *Free Speech and The Unconstitutional Application of The Riot code.*

Statutory provisions may be challenged on the grounds that they violate constitutional rights on their face *or as applied in a particular case. See, e.g., City of Eugene v. Lincoln*, 183 Or App 36, 39–41, 50 P3d 1253 (2002) (city trespass ordinance, although constitutional on its face, was applied in an unconstitutional fashion when police ordered the protester to leave county fair grounds and prosecuted her for noncompliance); *See also City of Eugene v. Miller,* 318 Ore. 480, 871 P.2d 454 (1994) (holding that city ordinance restricting sidewalk activity violated Art. I, sec. 8 as applied to defendant in that case).

In *Lincoln*, 183 Or App at 41, the court explained that

[t]he distinction between "facial" and "as-applied" challenges is based not on the validity of the government action involved but on whether the agent of the invalid action happens to be legislative as opposed to executive. A facial challenge asserts that lawmakers violated the constitution when they enacted the ordinance; an as-applied challenge asserts that executive officials, including police and prosecutors, violated the constitution when they enforced the ordinance.

Here, Mr. Gibson is charged with Riot for standing on a public sidewalk in protest.  The right to assemble and engage in advocacy in a traditional public forum such as a public sidewalk is conduct in the furtherance of constitutionally protected free speech. *See Hill v. Colorado*, 580 U.S. 703, 714-15, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2002) (noting that "the First Amendment interests of petitioners are clear and undisputed" because "their leafleting, sign displays and oral

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

4

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 4 of 8

1    communications are protected by the First Amendment," and that the "public sidewalks, streets

2    and ways" where they chose to exercise their rights "are 'quintessential' public forums for free

3    speech."); *NAACP v. State of Alabama*, 357 U.S. 449, 460 (1958) ("Effective advocacy of

4    both public and private points of view, particularly controversial ones, is undeniably enhanced by

5    group association, as this Court has more than once recognized by remarking upon the close nexus

6    between the freedoms of speech and assembly."); *See also Organization for a Better Austin v.*

7    *Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 29 L. Ed. 2d. 1 (1971) ("The claim that the expressions

8    were intended to exercise a coercive impact on respondent does not remove them from the reach

9    of the First Amendment"); *Hill*, 580 U.S. at 715 ("The fact that the messages conveyed by those

10   communication may be offensive to their recipients does not deprive them of constitutional

11   protection.").[2]

12         In *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207 (2011), the United States Supreme

13   Court held:

14             [S]peech on matters of public concern . . . is at the heart of the First Amendment's
15             protection.  The First Amendment reflects a profound national commitment to the
16             principle that debate on public issues should be uninhibited, robust, and wide-open.
17             That is because speech concerning public affairs is more than self-expression; it is
18             the essence of self-government.  Accordingly, speech on public issues occupies the
19             highest rung of the hierarchy of First Amendment values, and is entitled to special
20             protection.

21   *Id.*, 562 U.S. at 451-452 (internal quotation marks and citations omitted).   The Court also

22   emphasized that

---

[2] See also *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The government's ability to regulate speech in a traditional public forum, such as a street, sidewalk, or park, is 'sharply circumscribed.'"); *United States v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) (noting that public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered to be public forums); *see also Morse v. Frederick*, 551 U.S. 393, 127 S. Ct. 2618, 2626, 168 L. Ed. 2d 290 (2007) (Political speech, of course, is at the core of what the First Amendment is designed to protect.).

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

5

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 5 of 8

1         Such speech cannot be restricted simply because it is upsetting or arouses contempt.
2         If there is a bedrock principle underlying the First Amendment, it is that the
3         government may not prohibit the expression of an idea simply because society finds
4         the idea itself offensive or disagreeable.  Indeed, the point of all speech protection
5         . . . is to shield just those choices of content that in someone's eyes are misguided,
6         or even hurtful.

7    *Id.*, 562 U.S. at 458 (internal quotation marks and citations omitted).

8         Nor is it of any consequence to First Amendment protection that Mr. Gibson's decision to

9    livestream his visit to the sidewalk in front of Cider Riot met with hostility from the Antifa crowd.

10   As the Supreme Court has emphasized, speech

11         may indeed best serve its high purpose when it induces a condition of unrest, creates
12         dissatisfaction with conditions as they are, or even stirs people to anger. Speech is
13         often provocative and challenging. It may strike at prejudices and preconceptions
14         and have profound unsettling effects as it presses for acceptance of an idea.

15   *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S. Ct. 894, 896 (1949).

16        The District Attorney's Office may regard Mr. Gibson's attempts to induce the Antifa

17   participants to see the evil of their ways as highly unlikely to succeed, but the conduct is protected.

18        Mr. Gibson confined himself to making true comments during his livestream, and far from

19   authorizing, directing or ratifying any violent or tumultuous conduct, sought to limit any violence

20   by others that he observed.

21        As the United States Court of Appeals for the Seventh Circuit explained in reviewing the

22   convictions of the "Chicago Seven" for organizing the 1968 protests against the Vietnam War in

23   Chicago,

24         When the group activity out of which the alleged offense develops can be described
25         as a bifarious undertaking, involving both legal and illegal purposes and conduct,
26         and is within the shadow of the first amendment, the factual issue as to the alleged
27         criminal intent must be judged *strictissimi juris*. ***This is necessary to avoid***
28         ***punishing one who participates in such an undertaking and is in sympathy with***
29         ***its legitimate aims, but does not intend to accomplish them by unlawful means***.
30         Specially meticulous inquiry into the sufficiency of proof is justified and required

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

6

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 6 of 8

1
2
3
because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.

4  *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972) (emphasis added).

5  Without greater specificity in the charging document it is impossible to know what action

6  Mr. Gibson is alleged to have personally committed in violation of the law as it is clear that Mr.

7  Gibson was in a public forum engaging in protected expression at the time of the alleged offense.

8  CONCLUSION

9  As the accusatory instrument charges a crime clearly implicating the First Amendment to

10  the United States Constitution or Art. I, sec. 8, of the Oregon Constitution, greater specificity is

11  required so that Mr. Gibson can be actually informed of what he is being accused of having done.

12  The current charge is vague and uncertain as applied to Mr. Gibson.

13  For all the reasons stated, Mr. Gibson's demurrer should be allowed under ORS 135.630(4)

14  & (6).

15  Respectfully submitted this Wednesday, August 28, 2019.

*/s/ D. Angus Lee*
D. Angus Lee, WSBA# 36473 **Pro Hoc Vice**
Angus Lee Law Firm, PLLC
9105A NE HWY 99 Suite 200
Vancouver, WA 98665
Phone: 360.635.6464
Fax: 888.509.8268
E-mail: Angus@AngusLeeLaw.com
Attorney for Defendant JOSEPH GIBSON

*/s/James L. Buchal*
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com
Attorney for Defendant JOSEPH GIBSON

16

17

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

7

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 7 of 8

1

**CERTIFICATE OF SERVICE**

2

3        I, Carole A. Caldwell, hereby declare under penalty of perjury under the laws of the State
4   of Oregon that the following facts are true and correct:

5

6        I am a citizen of the United States, over the age of 18 years, and not a party to or
7   interested in the within entitled cause.  I am an employee of Murphy & Buchal LLP and my
8   business address is 3425 SE Yamhill Street, Suite 100, Portland, Oregon  97214.

9

10        On August 28, 2019, I caused the following document to be served:

11

12   JOSEPH GIBSON'S DEMURRER

13

14   in the following manner on the parties listed below:

15

| | | |
|---|---|---|
| Brad Kalbaugh | (X) | (BY FIRST CLASS US MAIL) |
| Multnomah County District Attorney's Office | (X) | (BY E-MAIL) |
| 600 Multnomah County Courthouse | ( ) | (BY FAX) |
| 1021 SW 4th Ave | ( ) | (BY HAND) |
| Portland OR 97204 | | |
| E-mail: brad.kalbaugh@mcda.us | | |

*/s/ Carole Caldwell*

16

JOSEPH GIBSON'S DEMURRER
No.  19CR53042
Wednesday, August 28, 2019

8

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 5, pg. 8 of 8

1

2

3

4

5

6

7

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

8  STATE OF OREGON,                              Consolidated Case No. 19CR53042

9                              Plaintiff,

10                                 v.                **DECLARATION OF AUBREY
                                                    HOFFMAN IN SUPPORT OF
11  JOSEPH OWAN GIBSON,                            DEFENDANTS'MOTION TO DISMISS
                                                    FOR SELECTIVE PROSECUTION**
12                              Defendant.

13  _____

STATE OF OREGON,                               Consolidated Case No. 19CR53035
14
                               Plaintiff,
15
                                  v.
16
RUSSELL SCHULTZ,
17
                               Defendant.
18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF
DEFENDANTS'MOTION TO DISMISS FOR SELECTIVE
PROSECUTION
Case Nos. 19CR53042; 19CR53035

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 6, pg. 1 of 5

1       1.    I, AUBREY HOFFMAN, declare under the penalty of perjury that the following

2  is true and correct to the best of my knowledge. I am over the age of eighteen, and I am

3  competent to testify to the matters herein. I have personal knowledge of the matters stated

4  herein, or as indicated, have information concerning those matters.

5       2.    I am the attorney of record for Russell Schultz, in *State of Oregon v. Russell*

6  *Schultz*, Case No. (19CR53035).

7       3.    I was admitted to the practice of law in 2016. I have spent the last approximately

8  four years practicing criminal defense in the State of Oregon. My Oregon Bar number is

9  164034.

10       4.    In Case No.19CR53035, Mr. Schultz is charged with a single count of riot.

11       5.    The Deputy District Attorneys primarily responsible for handling the prosecution

12  of Mr. Gibson and Mr. Schultz are Brad Kalbaugh and Sean Hughey.

13       6.    I have reviewed all discovery made available to me thus far in this matter.

14       7.    Based on my review of the discovery, I do not see evidence of any act that I

15  believe is, or could reasonably be interpreted as, tumultuous and violent by Mr. Schultz.

16       8.    What is clear to me from the discovery is that Mr. Schultz was in a public location

17  exercising his right of free expression nearby a Portland bar called Cider Riot.

18       9.    Specifically, the discovery shows that Mr. Gibson and Mr. Schultz went to that

19  location and protested the presence of what they believed to be members of Antifa at Cider Riot.

20      10.    The discovery shows a crowd of mostly masked individuals on the patio of Cider

21  Riot when Mr. Gibson and Mr. Schultz arrived and began to protest while live streaming on the

22  internet.

23      11.    Video of the protest shows the involvement of Mr. Schultz and Mr. Gibson during

24  the protest. Mr. Schultz is visible in the video and was wearing a red turtleneck shirt, with a dark

25  t- shirt on top of it, and a backwards hat.

26

27

28

DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF
DEFENDANTS'MOTION TO DISMISS FOR SELECTIVE
PROSECUTION
Case Nos. 19CR53042; 19CR53035

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

Exhibit 6, pg. 2 of 5

1    12.    The video appears to me to be devoid of any act of "violence" of "tumultuous

2    conduct" committed personally by Mr. Schultz.

3    13.    Mr. Schultz was not charged with any assault nor any other crime besides riot.

4    14.    Personally, seeing no evidence that I believed established that Mr. Schultz

5    engaged in riot, I joined in a motion for a bill of particulars which was filed by counsel for Mr.

6    Gibson. I also joined in a motion for change of venue that was filed by counsel for Mr. Gibson,

7    as I do not believe that Mr. Gibson or Mr. Schultz can receive a fair trial in Portland.

8    15.    A hearing on those motions, and other motions, was held on or about March 6,

9    2020.

10    16.    During a court recess of the March 6th hearing, I spoke directly and in person

11    with Deputy District Attorney Brad Kalbaugh about the case against Mr. Schultz.

12    17.    During that conversation, I told him that I did not see any evidence of violent or

13    tumultuous conduct by Mr. Schultz and wanted to know why he had been charged.

14    18.    Deputy District Attorney Kalbaugh did not deny my assertion, nor did he assert

15    that I was wrong. He did not identify any violent or tumultuous conduct by Mr. Schultz. Instead,

16    Deputy District Attorney Kalbaugh told me in clear terms that Mr. Schultz was being prosecuted

17    because he, and numerous others, stood around a fist fight between two other individuals at the

18    time of the protest.

19    19.    In my review of the discovery, I observed that there were numerous individuals

20    that were standing around the fist fight during the protest.

21    20.    On information and belief, neither of the two other individuals that were fist

22    fighting, nor any of the others that were standing around the fist fight, were charged with any

23    crime.

24    ///

25    ///

26    ///

27

28

3

DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF
DEFENDANTS'MOTION TO DISMISS FOR SELECTIVE
PROSECUTION
Case Nos. 19CR53042; 19CR53035

ANGUS LEE LAW FIRM, PLLC
9105A NE HWY 99, STE 200
Vancouver, WA 98665
(P) 360-635-6464 (F) 888-509-8268

1   I hereby declare that the above statement is true to the best of my knowledge and belief,

2   and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

3   I declare under penalty of perjury under the laws of the United States of America that the

4   foregoing is true and correct. 4/21/2021 | 2:29:02 PM PDT

5   Executed on this _____ th day of April, 2021.

6
    Aubrey Hoffman
    07ACFF6876FC409...
    /s/ Aubrey Hoffman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                    4
    DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF        ANGUS LEE LAW FIRM, PLLC
    DEFENDANTS'MOTION TO DISMISS FOR SELECTIVE         9105A NE HWY 99, STE 200
    PROSECUTION                                        Vancouver, WA 98665
    Case Nos. 19CR53042; 19CR53035                     (P) 360-635-6464 (F) 888-509-8268

1

## CERTIFICATE OF SERVICE

2    I, Carole A. Caldwell, hereby declare under penalty of perjury under the laws of the State of
3    Oregon that the following facts are true and correct:

4    I am a citizen of the United States, over the age of 18 years, and not a party to or interested in
     the within entitled cause. I am an employee of Murphy & Buchal LLP and my business address is
5    P.O. Box 86620, Portland, Oregon  97286..

6    On April 21, 2021, I caused the following document to be served:

7    DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF DEFENDANTS'MOTION
8    TO DISMISS FOR SELECTIVE PROSECUTION

9    in the following manner on the parties listed below:

10   Brad Kalbaugh                                      ( )    (BY FIRST CLASS US MAIL)
     Multnomah County District Attorney's Office       (X)    (BY E-MAIL)
11   600 Multnomah County Courthouse                    ( )    (BY FAX)
     1021 SW 4th Ave                                    ( )    (BY HAND)
12   Portland OR  97204                                 (X)    (E-Service, UTCR 21.100)
13   E-mail: brad.kalbaugh@mcda.us

14

15                                    /s/  Carole Caldwell

16

17

18

19

20

21

22

23

24

25

26

27

28                                          5
     DECLARATION OF AUBREY HOFFMAN IN SUPPORT OF          ANGUS LEE LAW FIRM, PLLC
     DEFENDANTS'MOTION TO DISMISS FOR SELECTIVE           9105A NE HWY 99, STE 200
     PROSECUTION                                          Vancouver, WA 98665
     Case Nos. 19CR53042; 19CR53035                       (P) 36 Exhibit 6, pg 8 of 58268

| | |
|---|---|
| **From:** | JEFFREY <jeffreyhowes@comcast.net> |
| **Sent time:** | 07/27/2020 05:05:36 PM |
| **To:** | HOWES Jeffrey |
| **Subject:** | Fwd: Draft of protest policy attached |
| **Attachments:** | Draft protest policy 7.24.20.docx |

Sent from Xfinity Connect App


------ Original Message ------

From: Mike Schmidt
To: jeffreyhowes@comcast.net
Sent: July 27, 2020 at 4:57 PM
Subject: Fwd: Draft of protest policy attached


Sent from my iPhone

Begin forwarded message:

>    **From:** Amy Weber
>    **Date:** July 24, 2020 at 11:20:54 AM PDT
>    **To:** Mike Schmidt , Jessica Brand
>    **Subject: Draft of protest policy attached**


>    Hi Mike.
>    Attached is a draft of a protest policy. If you are planning to release it, you may want to trim some
>    of this research out of here, but I wanted you to have the opportunity to read through it. Happy to
>    talk more about it when you have had a chance to look.
>    Amy

>    Amy Weber
>    The Wren Collective, LLC
>    wrencollective.com
>    (305) 793-7321 (cell)
>    (919) 869-7970 (office)

000002

**RESEARCH AND POLICY ON PROSECUTING PROTEST CASES**

Following the murder of George Floyd in Minneapolis, members of our community have taken to the streets every night to express their collective grief, anger, and frustration over not just this senseless act of violence, but the countless other abuses people of color have endured in our country throughout its history.  Their calls for change go beyond an end to police violence and encompass the need for all of us to acknowledge and address centuries of racism and oppression, racism that has manifested itself in mass incarceration, economic inequality, educational disadvantages, and disparities in health care that have allowed COVID-19 to ravage our communities of color.

As prosecutors, we must acknowledge the depth of emotion that has motivated these protests and recognize that we will undermine public safety, not promote it, if we leverage the force of our criminal justice system against peaceful protestors who are simply demanding to be heard.

Therefore, our Office will apply the presumptions detailed below to all arrests arising from the protests in our community.  As with all presumptions, where an individual case presents unusual, aggravating circumstances, line prosecutors may obtain supervisor approval to proceed with the case.

## I.      Background on declination of criminal charges

Before the Office can commit to the large-scale declination of a class of criminal charges, we must first examine whether prosecuting these cases is necessary for or advances public safety.

Research shows that it is extremely unlikely that any observable increase in crime would result from the large-scale dismissal of protest-related cases.  Any criticism that, by declining to prosecute these matters, we are encouraging or motivating protestors to break the law has no empirical support. The truth is that any individual who is not dissuaded from illegal conduct by the threat of police violence against them or by the likelihood of arrest will also not be influenced by whether or not prosecution might follow.

A prosecutor choosing to decline to prosecute a case is not legalizing the underlying conduct. Police make the decisions whether to arrest a person, and may continue to do so as long as the arrest itself is lawful. Declining to prosecute cases in no way undermines the legality of an arrest or changes Oregon law.

In addition, a prosecutor's evidence-based decision to decline a certain case will not lead to any increase in criminal conduct. Because individuals will still be subject to arrest, the policy would only impact rates of offending if the prosecution itself, isolated from the underlying arrest, affects behavior. Numerous studies show that, while the degree to

Draft protest policy 7.24.20.docx

000003

which criminal prohibition deters the general public from offending ("general deterrence") is influenced by the certainty of apprehension, it is largely unaffected by the severity of punishment that follows.[1]

Explanations for this result are many, but largely rest on the observation that arrest itself carries a number of negative informal consequences ("unpleasantness of the apprehension itself, possible loss of liberty due to pretrial detention, ... legal fees, ... social and economic costs triggered by arrest, even without conviction, such as disapproval of family, friends, and the community at large, as well as job loss") that, for most individuals, are the primary forces preventing criminal activity.[2] Whether or not that arrest is followed by a prosecution, however, has little to no effect. Therefore, any criticism that a declination policy is akin to legalization or encourages criminal activity is entirely unfounded.

For arrested individuals, the vast majority of research shows that prosecution does not reduce future criminal activity ("specific deterrence"), but rather has no effect or promotes it.[3] In fact, imposing more severe sanctions actually <u>increases</u> the likelihood a person will commit another offense in the future.[4] Prosecuting protestors then, may undermine public safety in the long run by imposing a criminal record upon a large number of individuals who will then have greater difficulties obtaining housing, employment, and stability. These effects are why research on deterrence supports a policy in which criminal justice "contact or arrest and any subsequent sanction should be as lenient as possible within the limits of public safety."[5]

There are also no studies that support the claim that failing to prosecute low-level offenses will embolden individuals to commit more serious crimes. To the contrary, the existing research shows that specific deterrence, to the extent it exists at all, doesn't translate between offenses. "[A]ttempts by authorities to crack down on minor crimes ... are not likely to spill over to affect beliefs about the probability of arrest for more serious crimes."[6]

---

[1] Daniel S. Nagin, *Deterrence in the Twenty-First Century*, in Michael Tonry, ed., CRIME AND JUSTICE IN AMERICA, 1975-2025, v. 42 (2013), 201-202.

[2] *Id.* at 210.

[3] David Huizinga and Kimberly L. Henry, *The Effect of Arrest and Justice System Sanctions on Subsequent Behavior: Findings from Longitudinal and Other Studies*, in Akiva M. Liberman, ed., THE LONG VIEW ON CRIME: A SYNTHESIS OF LONGITUDINAL RESEARCH (2008) at 244.

[4] *Id.*

[5] *Id.* at 250 ("Whether to employ no sanctions, lenient sanctions, or harsh sanctions cannot be determined by the effect on the offender; the outcome is the same.").

[6] Raymond Paternoster, *How Much Do We Really Know about Criminal Deterrence?*, 100 J. CRIM. L. & CRIMINOLOGY 765, 809 (2010), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=7363&context=jclc.

000004

Draft protest policy 7.24.20.docx

## II.     Draft Protest Policy

For all arrests made during the protests in Portland, our Office will apply the following presumptions:

### 1.     Presumption of dismissal/declination:

We will presumptively decline to charge ordinance violations and misdemeanors that do not involve deliberate property damage, theft, or the use or threat of force against another person.  **Misdemeanors** in this category include:

- Interference with a police officer, ORS § 162.247
- Disorderly conduct, ORS § 166.025
- Resisting arrest, ORS § 162.315
- Criminal trespass, ORS §§ 164.245 and 164.255
- Escape III, ORS § 162.145
- Harassment where the facts do not allege physical contact with another, ORS § 166.065
- Unlawful directing light from a laser pointer, ORS § 163.709

### 2.     Presumption of dismissal/declination unless body worn camera footage is available or there is a civilian complainant or witness:

- Attempted or completed Assault III or IV, ORS §§ 163.165 and 163.160, where any injury alleged was minor or temporary
- Attempted or completed Assault on a public safety officer, ORS § 163.208
- Riot, ORS § 166.015
- Recklessly endangering another person, ORS § 163.195

### 3.     Presumption of community court/conditional dismissal:

In some felony charges, as well as where an individual has been accused of a misdemeanor or felony causing financial but not physical harm to another during a protest, there will be a presumption that the individuals will either be offered community court or a conditional dismissal after restitution is paid to the victim or other amends to the community are made.  Offenses in this category include:

- Criminal mischief, all degrees, ORS §§ 164.345, 164.354, 164.365
- Theft, all degrees, ORS §§ 164.015, 164.043, 164.045, 164.055.
- Burglary II, ORS § 164.215

### 4.     Offenses handled in the normal course:

000005

Draft protest policy 7.24.20.docx

All other offenses, including those that allege acts of physical violence against civilians or are corroborated by video evidence, will be handled according to our general office policies.

GIBSON_MCDA_033063



# Mike Schmidt, District Attorney

**1021 SW Fourth Avenue, Room 602**
**Portland, OR 97204-1912**
**Phone: 503-988-3162  Fax: 503-988-3643**
**www.mcda.us**

## POLICY REGARDING PROTEST RELATED CASES

Members of our community have taken to the streets every night since the murder of George Floyd to express their collective grief, anger, and frustration over not just that senseless act of violence, but the countless other abuses People of Color have endured in our country throughout history. The demands for change go beyond calling for an end to police violence and encompass the need for all of us to acknowledge and address centuries of racism and oppression that are manifested in mass incarceration, economic inequality, educational disadvantages, and disparities in health care that have allowed COVID-19 to ravage our communities of color.

As prosecutors, we acknowledge the depth of emotion that motivates these demonstrations and support those who are civically engaged through peaceful protesting. We recognize that we will undermine public safety, not promote it, if we leverage the force of our criminal justice system against peaceful protestors who are demanding to be heard.

The Multnomah County District Attorney's Office will always strive to advance the safety of our community and its members. We recognize the need to broaden our vision of what a safe community means and our role in promoting that vision. To advance public safety we must not only prevent crime, but must also promote economic and housing stability, educational opportunities, strong family and community relationships, and the mental and physical health of all those who live in our county.

Seen through that lens, the prosecution of cases relating solely to protest activities, most of which have a weak nexus to further criminality and which are unlikely to be deterred by prosecution, draws away from crucially needed resources. As stewards of public resources, we must devote our efforts to prosecuting crimes that allow us to protect our most vulnerable victims to have the greatest impact on promoting a safer community for everyone in Multnomah County.

For these reasons, our Office will apply the following presumptions to all referred cases arising from the current protests in our community. A prosecutor choosing to decline to prosecute a case is not condoning or endorsing the conduct that led to the arrest and/or citation. A decision to not prosecute a case is not a comment on whether or not the arrest was lawful. As with all presumptions, where an individual case presents unusual, aggravating circumstances, line prosecutors may obtain supervisor approval to proceed with the case.

August 11, 2020

GIBSON_MCDA_003273

**1.      Presumption of dismissal/declination:**

We will presumptively decline to charge cases where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person. Crimes in this category include:

- Interference with a police officer, ORS 162.247
- Disorderly conduct, ORS 166.025
- Criminal trespass, ORS 164.245 and 164.255
- Escape III, ORS 162.145
- Harassment, when classified as a Class B misdemeanor, ORS 166.065
- Riot, ORS 166.015 – Unless accompanied by a charge outside of this list

**2.      Resisting Arrest, ORS § 162.315:**

Any charge of resisting arrest that arises from protesting activity should be subjected to a high level of scrutiny by the issuing deputy. Consideration should be given to the chaos of a protesting environment, especially after tear gas or other less-lethal munitions have been deployed against protestors en masse. Issuing deputies will consider the following (non-exclusive) list of factors prior to issuing a protest related resist arrest charge:

- Did law enforcement have probable cause for the arrest for a crime beyond those listed in Sec II (1) of this policy?
- Had the defendant been recently subjected to tear gas or other less lethal force? Were they otherwise in pain, or unable to hear, breathe or see at the moment the resistance occurred?
- Was the character of the resistance unreasonably severe?
- Did the act of resistance result in injury to the officer?
- What level of force was applied by the officer, and did they make any reasonable available attempt to de-escalate before making the arrest?
- Has all available video evidence been received and reviewed?

Due to the sensitive and difficult nature of these cases, issuing deputies are encouraged to consult with their senior or chief DDA or the First Assistant as necessary prior to making a final decision to issue the case.

A DDA who wishes to issue a misdemeanor case that includes a resisting arrest or attempted assault of a public safety officer must obtain the approval of the senior deputy of either the Strategic Prosecution and Services Unit, Misdemeanor Trial Unit, or Pretrial Unit.

August 11, 2020

**3. Assaulting a Public Safety Officer/ Attempted APSO – ORS 163.208:**

Any charge of assaulting a public safety officer, or attempting to assault a public safety officer, which arises from protesting activity should be subjected to a high level of scrutiny by the issuing deputy. Consideration should be given to the chaos of a protesting environment, especially after tear gas or other less-lethal munitions have been deployed against protestors en masse. Issuing deputies will consider the following (non-exclusive) list of factors prior to issuing a protest related charge of assaulting a public safety officer:

- Did law enforcement have probable cause for the arrest for a crime beyond those listed in Sec II (1) of this policy?
- Had the defendant been recently subjected to tear gas or other less lethal force? Were they otherwise in pain, or unable to hear, breathe or see at the moment the assaultive conduct occurred?
- If the allegation is that of a completed APSO, is there adequate documentation of the specific cause of the injury and of the severity of the injury?
- If the allegation is that of an attempted APSO, the level of scrutiny shall be even greater than that of a completed act.
- Has all available video evidence been received and reviewed?

Due to the sensitive and difficult nature of these cases, issuing deputies are encouraged to consult with their senior or chief DDA or the First Assistant as necessary prior to making a final decision to issue the case.

A DDA who wishes to issue a misdemeanor case that includes a resisting arrest or attempted assault of a public safety officer must obtain the approval of the senior deputy of either the Strategic Prosecution and Services, Misdemeanor Trial, or Pretrial Unit.

**4.      Presumption of conditional dismissal:**

Where an individual is accused of a misdemeanor or felony causing financial but not physical harm to another during a protest, there will be a presumption that the individuals will either be offered conditional dismissal after restitution is paid to the victim or other amends to the community are made, including restorative justice with the impacted victim. The District Attorney expects that, to qualify for a dismissal, the individual will complete all requirements within a three-month time span. Offenses in this category include:

- Criminal mischief, in an amount under $1000, ORS 164.345, 164.354. A conditional dismissal may also be granted in an amount higher than $1000 if the damage is entirely due to vandalism.
- Theft, in an amount under $1000, ORS 164.015, 164.043, 164.045, 164.055(1)(b).
- Burglary II if combined with the above, ORS 164.215.

A person is eligible for this dismissal where the charges resulted in response to a single

August 11, 2020

criminal incident. Where immigration consequences are or may be implicated, line prosecutors will discuss resolutions with their supervisor prior to extending a conditional dismissal offer.

**5.     Offenses handled in the normal course:**

All other offenses, including those that allege acts of physical violence against civilians will be handled according to our general office policies.

In all cases where charges are declined or dismissed, this office will make available information on the procedure to set aside the record of arrest, and will support these motions in every way permissible under law.

August 11, 2020

GIBSON_MCDA_003276

**From:** D. Angus Lee <angus@anguslaw.com>
**Sent:** Tuesday, August 11, 2020 6:13 PM
**To:** Brad Kalbaugh <brad.kalbaugh@mcda.us>
**Cc:** HUGHEY Sean <sean.hughey@mcda.us>; James Buchal <jbuchal@mbllp.com>
**Subject:** REQUEST FOR APPLICATION OF NEW MCDA POLICY REGARDING PROTEST RELATED CASE TO 19CR53042

Dear Mr. Kalbaugh,

Please see the attached letter.

Upon review of the newly announced Multnomah County District Attorney's Office (MCDA) policy to dismiss protest related cases where the most serious charge is riot, we respectfully request that the case against Mr. Gibson be dismissed, since during his protest activities, he did not engage in any conduct amounting to assault or damage any property, and the most serious offense with which he is charged is riot.

According to the MCDA policy, there is a "**Presumption of dismissal**" in cases "where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person." The policy on presumptive dismissal specifically includes cases where the most serious charge is riot, *which is Mr. Gibson's only charge.*

In March, you correctly stated on the record at the motion hearing, that Mr. Gibson had not personally engaged in conduct that would even amount to an assault during the protest from which his riot charge arose. Accordingly, the presumption of dismissal applies.

Like Demetria Hester, who's charges were immediately dismissed in accord with the MCDA policy, Mr. Gibson's role in various protests was that of a speaker.

We therefore call upon your office to provide equal application of the MCDA policy and dismiss the charge against Mr. Gibson just as you would for any other individual charged only with riot.

Under the formal MCDA policy, the riot charge against Mr. Gibson must be dismissed.

Angus

Angus Lee Law Firm, PLLC
www.AngusLeeLaw.com
MAIL: 9105A NE HWY 99 STE 200, Vancouver WA 98665
Phone: 360.635.6464 — 800.691.0039
Fax: 888.509.8268

NOTE: This e-mail is from a law firm, Angus Lee Law Firm, PLLC (Firm), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of the Firm, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to the Firm in reply that you expect it to hold in confidence. If you properly received

this e-mail as a client, co-counsel or retained expert of the Firm, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.  This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

Exhibit 9, pg. 2 of 11



**ANGUS LEE**
LAW FIRM, PLLC

WWW.ANGUSLEELAW.COM
(P) 360-635-6464 (F) 888-509-8268
9105A NE HWY 99, Suite 200
Vancouver, WA 98665

Tuesday, August 11, 2020 A.D.

**Brad Kalbaugh, Deputy District Attorney**
Multnomah County District Attorney's Office
1021 SW 4th Ave
Portland OR 97204
E-mail: brad.kalbaugh@mcda.us

RE:    REQUEST FOR APPLICATION OF NEW MCDA POLICY
REGARDING PROTEST RELATED CASE TO 19CR53042

Dear Mr. Kalbaugh,

Upon review of the newly announced Multnomah County District Attorney's Office (MCDA) policy to dismiss protest related cases where the most serious charge is riot, we respectfully request that the case against Mr. Gibson be dismissed, since during his protest activities, he did not engage in any conduct amounting to assault or damage any property, and the most serious offense with which he is charged is riot.

According to the MCDA policy, there is a "**Presumption of dismissal**" in cases "where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person."  The policy on presumptive dismissal specifically includes cases where the most serious charge is riot, *which is Mr. Gibson's only charge*.

In March, you correctly stated on the record at the motion hearing, that Mr. Gibson had not personally engaged in conduct that would even amount to an assault during the protest from which his riot charge arose.  Accordingly, the presumption of dismissal applies.

Like Demetria Hester, who's charges were immediately dismissed in accord with the MCDA policy, Mr. Gibson's role in various protests was that of a speaker.

We therefore call upon your office to provide equal application of the MCDA policy and dismiss the charge against Mr. Gibson just as you would for any other individual charged only with riot.

Under the formal MCDA policy, the riot charge against Mr. Gibson must be dismissed.

Sincerely,

D. Angus Lee

Enclosed: MCDA POLICY REGARDING PROTEST RELATED CASES



# Mike Schmidt, District Attorney

**1021 SW Fourth Avenue, Room 602**
**Portland, OR 97204-1912**
**Phone: 503-988-3162  Fax: 503-988-3643**
**www.mcda.us**

## POLICY REGARDING PROTEST RELATED CASES

Members of our community have taken to the streets every night since the murder of George Floyd to express their collective grief, anger, and frustration over not just that senseless act of violence, but the countless other abuses People of Color have endured in our country throughout history. The demands for change go beyond calling for an end to police violence and encompass the need for all of us to acknowledge and address centuries of racism and oppression that are manifested in mass incarceration, economic inequality, educational disadvantages, and disparities in health care that have allowed COVID-19 to ravage our communities of color.

As prosecutors, we acknowledge the depth of emotion that motivates these demonstrations and support those who are civically engaged through peaceful protesting. We recognize that we will undermine public safety, not promote it, if we leverage the force of our criminal justice system against peaceful protestors who are demanding to be heard.

The Multnomah County District Attorney's Office will always strive to advance the safety of our community and its members. We recognize the need to broaden our vision of what a safe community means and our role in promoting that vision. To advance public safety we must not only prevent crime, but must also promote economic and housing stability, educational opportunities, strong family and community relationships, and the mental and physical health of all those who live in our county.

Seen through that lens, the prosecution of cases relating solely to protest activities, most of which have a weak nexus to further criminality and which are unlikely to be deterred by prosecution, draws away from crucially needed resources. As stewards of public resources, we must devote our efforts to prosecuting crimes that allow us to protect our most vulnerable victims to have the greatest impact on promoting a safer community for everyone in Multnomah County.

For these reasons, our Office will apply the following presumptions to all referred cases arising from the current protests in our community. A prosecutor choosing to decline to prosecute a case is not condoning or endorsing the conduct that led to the arrest and/or citation. A decision to not prosecute a case is not a comment on whether or not the arrest was lawful. As with all presumptions, where an individual case presents unusual, aggravating circumstances, line prosecutors may obtain supervisor approval to proceed with the case.

August 11, 2020

**1.    ==Presumption of dismissal==/declination:**

We will presumptively decline to charge cases where the most serious offenses are city ordinance violations and crimes that do not involve deliberate property damage, theft, or the use or threat of force against another person. Crimes in this category include:

- Interference with a police officer, ORS 162.247
- Disorderly conduct, ORS 166.025
- Criminal trespass, ORS 164.245 and 164.255
- Escape III, ORS 162.145
- Harassment, when classified as a Class B misdemeanor, ORS 166.065
- Riot, ORS 166.015 – <u>Unless accompanied by a charge outside of this list</u>

**2.    Resisting Arrest, ORS § 162.315:**

Any charge of resisting arrest that arises from protesting activity should be subjected to a high level of scrutiny by the issuing deputy. Consideration should be given to the chaos of a protesting environment, especially after tear gas or other less-lethal munitions have been deployed against protestors en masse. Issuing deputies will consider the following (non-exclusive) list of factors prior to issuing a protest related resist arrest charge:

- Did law enforcement have probable cause for the arrest for a crime beyond those listed in Sec II (1) of this policy?
- Had the defendant been recently subjected to tear gas or other less lethal force? Were they otherwise in pain, or unable to hear, breathe or see at the moment the resistance occurred?
- Was the character of the resistance unreasonably severe?
- Did the act of resistance result in injury to the officer?
- What level of force was applied by the officer, and did they make any reasonable available attempt to de-escalate before making the arrest?
- Has all available video evidence been received and reviewed?

Due to the sensitive and difficult nature of these cases, issuing deputies are encouraged to consult with their senior or chief DDA or the First Assistant as necessary prior to making a final decision to issue the case.

A DDA who wishes to issue a misdemeanor case that includes a resisting arrest or attempted assault of a public safety officer must obtain the approval of the senior deputy of either the Strategic Prosecution and Services Unit, Misdemeanor Trial Unit, or Pretrial Unit.

August 11, 2020

**3. Assaulting a Public Safety Officer/ Attempted APSO – ORS 163.208:**

Any charge of assaulting a public safety officer, or attempting to assault a public safety officer, which arises from protesting activity should be subjected to a high level of scrutiny by the issuing deputy. Consideration should be given to the chaos of a protesting environment, especially after tear gas or other less-lethal munitions have been deployed against protestors en masse. Issuing deputies will consider the following (non-exclusive) list of factors prior to issuing a protest related charge of assaulting a public safety officer:

- Did law enforcement have probable cause for the arrest for a crime beyond those listed in Sec II (1) of this policy?
- Had the defendant been recently subjected to tear gas or other less lethal force? Were they otherwise in pain, or unable to hear, breathe or see at the moment the assaultive conduct occurred?
- If the allegation is that of a completed APSO, is there adequate documentation of the specific cause of the injury and of the severity of the injury?
- If the allegation is that of an attempted APSO, the level of scrutiny shall be even greater than that of a completed act.
- Has all available video evidence been received and reviewed?

Due to the sensitive and difficult nature of these cases, issuing deputies are encouraged to consult with their senior or chief DDA or the First Assistant as necessary prior to making a final decision to issue the case.

A DDA who wishes to issue a misdemeanor case that includes a resisting arrest or attempted assault of a public safety officer must obtain the approval of the senior deputy of either the Strategic Prosecution and Services, Misdemeanor Trial, or Pretrial Unit.

**4.    Presumption of conditional dismissal:**

Where an individual is accused of a misdemeanor or felony causing financial but not physical harm to another during a protest, there will be a presumption that the individuals will either be offered conditional dismissal after restitution is paid to the victim or other amends to the community are made, including restorative justice with the impacted victim. The District Attorney expects that, to qualify for a dismissal, the individual will complete all requirements within a three-month time span. Offenses in this category include:

- Criminal mischief, in an amount under $1000, ORS 164.345, 164.354. A conditional dismissal may also be granted in an amount higher than $1000 if the damage is entirely due to vandalism.
- Theft, in an amount under $1000, ORS 164.015, 164.043, 164.045, 164.055(1)(b).
- Burglary II if combined with the above, ORS 164.215.

A person is eligible for this dismissal where the charges resulted in response to a single

August 11, 2020

criminal incident. Where immigration consequences are or may be implicated, line prosecutors will discuss resolutions with their supervisor prior to extending a conditional dismissal offer.

**5.      Offenses handled in the normal course:**

All other offenses, including those that allege acts of physical violence against civilians will be handled according to our general office policies.

In all cases where charges are declined or dismissed, this office will make available information on the procedure to set aside the record of arrest, and will support these motions in every way permissible under law.

August 11, 2020

**From:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>
**Sent:** Thursday, August 13, 2020 11:55 AM
**To:** 'D. Angus Lee' <angus@angusleelaw.com>
**Cc:** HUGHEY Sean <sean.hughey@mcda.us>; James Buchal <jbuchal@mbllp.com>
**Subject:** RE: REQUEST FOR APPLICATION OF NEW MCDA POLICY REGARDING PROTEST RELATED CASE TO 19CR53042

I am meeting with Mr. Schmidt tomorrow. I expect to have an answer for you (and everyone else) after that meeting. Sorry for the delayed reply.

**From:** D. Angus Lee <angus@angusleelaw.com>
**Sent:** Thursday, August 13, 2020 11:48 AM
**To:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>
**Cc:** HUGHEY Sean <sean.hughey@mcda.us>; James Buchal <jbuchal@mbllp.com>
**Subject:** Re: REQUEST FOR APPLICATION OF NEW MCDA POLICY REGARDING PROTEST RELATED CASE TO 19CR53042

Brad and Sean:

If you are considering dismissal, or not, please, as a courtesy, let me know.

My pro hoc vice admission expires at the end of the month and I will need to renew that and pay a fee if the case is going forward.  If it is under consideration for dismissal it would be nice to not waste the time and money with the application.

Best regards,


Angus

Angus Lee Law Firm, PLLC
www.AngusLeeLaw.com
MAIL: 9105A NE HWY 99 STE 200, Vancouver WA 98665
Phone: 360.635.6464 — 800.691.0039
Fax: 888.509.8268

NOTE: This e-mail is from a law firm, Angus Lee Law Firm, PLLC (Firm), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of the Firm, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to the Firm in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of the Firm, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.  This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

Exhibit 9, pg. 8 of 11

**From:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>
**Sent:** Thursday, August 13, 2020 12:29 PM
**To:** James Buchal <jbuchal@mbllp.com>; 'D. Angus Lee' <angus@anguslelaw.com>
**Cc:** HUGHEY Sean <sean.hughey@mcda.us>
**Subject:** RE: REQUEST FOR APPLICATION OF NEW MCDA POLICY REGARDING PROTEST RELATED CASE TO 19CR53042

That will not be necessary. Thank you.

**From:** James Buchal <jbuchal@mbllp.com>
**Sent:** Thursday, August 13, 2020 12:06 PM
**To:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>; 'D. Angus Lee' <angus@anguslelaw.com>
**Cc:** HUGHEY Sean <sean.hughey@mcda.us>
**Subject:** RE: REQUEST FOR APPLICATION OF NEW MCDA POLICY REGARDING PROTEST RELATED CASE TO 19CR53042

We would be very pleased to join the meeting to answer any questions about Mr. Gibson, show relevant portions of the videos, and point out his continuing good behavior in the fifteen months since the events at Cider Riot.

James L. Buchal
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214

Phone:  503-227-1011
Fax:  503-573-1939

1

**From:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>
**Sent:** Friday, August 14, 2020 3:21 PM
**To:** 'D. Angus Lee' <angus@angusleelaw.com>
**Cc:** James Buchal <jbuchal@mbllp.com>; David Peters <davepeters1@yahoo.com>; Aubrey Hoffman
<aubrey@aubreyhoffmanlaw.com>; kdoyleatty@aol.com; HUGHEY Sean <sean.hughey@mcda.us>
**Subject:** RE: Cider Riot Trials will not be dismissed

Attached, please find a copy of the policy.

**From:** D. Angus Lee <angus@angusleelaw.com>
**Sent:** Friday, August 14, 2020 3:02 PM
**To:** KALBAUGH Brad <Brad.KALBAUGH@mcda.us>
**Cc:** James Buchal <jbuchal@mbllp.com>; David Peters <davepeters1@yahoo.com>; Aubrey Hoffman
<aubrey@aubreyhoffmanlaw.com>; kdoyleatty@aol.com; HUGHEY Sean <sean.hughey@mcda.us>
**Subject:** Re: Cider Riot Trials will not be dismissed

Brad:

Thanks for the email.  So if I understand correctly, this policy will not be applied to any of the riot type cases
arising out of events in May, June, July, or August 1-10 of this year?  If I understand incorrectly, what is the
start date for the application of this policy.

Angus

Angus Lee Law Firm, PLLC
www.AngusLeeLaw.com
MAIL: 9105A NE HWY 99 STE 200, Vancouver WA 98665
Phone: 360.635.6464 — 800.691.0039
Fax: 888.509.8268

Exhibit 9, pg. 10 of 11

NOTE: This e-mail is from a law firm, Angus Lee Law Firm, PLLC (Firm), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of the Firm, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to the Firm in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of the Firm, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.  This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

On Aug 14, 2020, at 2:44 PM, KALBAUGH Brad <Brad.KALBAUGH@mcda.us> wrote:

All,

My office's new policy pertaining to riot trials is not retroactive. The state will not be dismissing any of the charges currently pending against Mr. Kramer, Mr. Schultz, Mr. Gibson, and Mr. Lewis in regard to the incident that occurred on 5/1/19.

- Brad Kalbaugh, OSB#074335
  Deputy District Attorney, Unit C
  Multnomah County

Confidentiality: This e-mail transmission may contain confidential and/or privileged information. The information contained herein is intended for the addressee only. If you are not the addressee, please do not review, disclose, copy or distribute this transmission. If you have received this transmission in error, please contact the sender immediately.

Confidentiality: This e-mail transmission may contain confidential and/or privileged information. The information contained herein is intended for the addressee only. If you are not the addressee, please do not review, disclose, copy or distribute this transmission. If you have received this transmission in error, please contact the sender immediately.

Exhibit 9, pg. 11 of 11

ELLEN F. ROSENBLUM
Attorney General
JILL SCHNEIDER  #001619
Senior Assistant Attorney General
DAVID BERRYMAN, #183049
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  Jill.Schneider@doj.state.or.us
David.Berryman@doj.state.or.us

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JOSEPH GIBSON and RUSSELL SCHULTZ, | Case No.  3:20-cv-01580-SB |
| Plaintiffs, | DECLARATION OF BRAD KALBAUGH IN SUPPORT OF DEFENDANTS' RESPONSE TO MOTION ON JURISDICTION |
| v. | |
| MIKE SCHMIDT, in his official capacity as District Attorney of Multnomah County, Oregon, MULTNOMAH COUNTY DISTRICT ATTORNEY'S OFFICE, and BRAD KALBAUGH, in his official capacity as a Multnomah County Deputy District Attorney, | |
| Defendants. | |

I, Brad Kalbaugh, declare:

1.    I am a Deputy District Attorney for Multnomah County and have been employed

in that capacity since May of 2018.

Page 1 -    DECLARATION OF BRAD KALBAUGH IN SUPPORT OF DEFENDANTS'
RESPONSE TO MOTION ON JURISDICTION
JS/lf1/Gibson 1580 PLD Decl of Kalbaugh iso Defs Rsp to Mtn on Jdx

Exhibit 10, pg. 1 of 5

2.      As part of the general scope of my professional responsibilities, I review case files that are referred to my office by law enforcement in order to determine whether criminal charges can be proven beyond a reasonable doubt and, if so, whether to exercise prosecutorial discretion to issue charges based on office policies and the interests of justice.

3.      I reviewed Portland Police Bureau case no 2019-141483 for consideration of charges regarding a violent incident involving dozens of people that occurred on or about May 1, 2019, outside of a business named "Cider Riot".

4.      After reviewing Portland Police Bureau case no 2019-141483, speaking with law enforcement, viewing the video evidence that had been collected, and reviewing relevant case law pertaining to the crime of riot in violation of ORS 166.015, I issued criminal charges against Joseph Gibson, Russell Schultz, Ian Kramer, Matthew Cooper, Christopher Ponte, and Mackenzie Williams for crime(s) they committed in relation to the May 1, 2019, incident outside of "Cider Riot".

5.      To commence prosecution, I prepared an affidavit of probable cause, an arrest warrant, a charging instrument, and a motion to seal these documents in accordance with ORS 131.005 et seq, ORS 133.140, and ORS 135.873.

6.      I presented the affidavit of probable cause, the arrest warrant, the charging instrument, and the motion to seal to a judge in accordance with ORS 133.110.

7.      After reviewing the documents, the judge signed the arrest warrant and granted the state's motion to seal both the affidavit and the accompanying charging document.

8.      I submitted indictments to the grand jury against Joseph Gibson, Russell Schultz, Ian Kramer, Matthew Cooper, Christopher Ponte, and Mackenzie Williams pursuant to ORS 132.250 et. seq.

9.      The grand jury endorsed the indictments as true bills in accordance with ORS 132.400.

10.     The indictment was filed with the clerk of the court in accordance with 132.410.

Page 2 -     DECLARATION OF BRAD KALBAUGH IN SUPPORT OF DEFENDANTS'
             RESPONSE TO MOTION ON JURISDICTION
             JS/lf1/Gibson 1580 PLD Decl of Kalbaugh iso Defs Rsp to Mtn on Jdx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

11.     Joseph Gibson, Russell Schultz, Ian Kramer, Matthew Cooper, Christopher Ponte, and Mackenzie Williams each were arraigned on the indictments in accordance with ORS 135.010.

12.     I spoke to Aubrey Hoffman regarding the charge of riot against Russell Schultz.  I told her that the evidence against her client did not include show him physically assaulting anyone.  Rather, the state's theory of the case was that Mr. Schultz participated with a group of five or more people engaging in tumultuous and violent conduct in violation of ORS 166.015 as that statute has been interpreted by Oregon case law.

13.     Attached as Exhibit A is the Affidavit in Support of an Arrest Warrant for Violation of ORS 166.015 I filed against Joseph Owan Gibson on August 12, 2019.

14.     Attached as Exhibit B is the charging instrument ORS 133.110 requires to accompany the arrest warrant for Joseph Owan Gibson.

15      Attached as Exhibit C is the Affidavit in Support of an Arrest Warrant for Violation of ORS 166.015 I filed against Russell Schultz on August 12, 2019.

16.     Attached as Exhibit D is the charging instrument ORS 133.110 requires to accompany the arrest warrant for Russell Schultz.

17.     On May 19, 2020, Mike Schmidt was elected to replace Rod Underhill as the county's district attorney after winning enough votes in the primary election to cancel the contest in the general election scheduled to occur on November 3, 2020.

18.     On May 25, 2020, George Floyd was killed by Minneapolis police while in custody; this event sparked a series of mass demonstrations that continued unabated nightly for several months.

19.     On August 1, 2020, Oregon Governor Kate Brown appointed Mike Schmidt as the District Attorney of Multnomah County after Rod Underhill announced that he would be resigning prior to the end of his term.

Page 3 -     DECLARATION OF BRAD KALBAUGH IN SUPPORT OF DEFENDANTS'
RESPONSE TO MOTION ON JURISDICTION
JS/lf1/Gibson 1580 PLD Decl of Kalbaugh iso Defs Rsp to Mtn on Jdx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

Exhibit 10, pg. 3 of 5

20.     On August 11, 2020, Mike Schmidt announced a new office policy regarding the issuance and prosecution of riot charges.

21.     On August 12, 2020, I received an email from Aubrey Hoffman asking whether the state would be dismissing the riot charge pending against Russell Schultz.

22.     On August 13, 2020, I received an email from D. Angus Lee asking whether the state would be dismissing the riot charge pending against Joseph Gibson.

23.     On August 14, 2020, I met with District Attorney Schmidt to clarify whether the policy was retroactive specifically with respect to the criminal charges pending against Joseph Gibson, Russell Schultz, and Mackenzie Lewis in regard to the May 1, 2019, incident at Cider Riot.

24.     After the August 14, 2020, meeting, I emailed the attorneys representing Joseph Gibson, Russell Schultz, and Mackenzie Lewis, and stated:

> My office's new policy pertaining to riot trials is not retroactive. The state will not be dismissing any of the charges currently pending against Mr. Kramer, Mr. Schultz, Mr. Gibson, and Mr. Lewis in regard to the incident that occurred on 5/1/19.

25.     On August 14, 2020, D. Angus Lee replied to my email with the following clarifying question:

> Thanks for the email. So if I understand correctly, this policy will not be applied to any of the riot type cases arising out of events in May, June, July, or August 1-10 of this year? If I understand incorrectly, what is the start date for the application of this policy?

Page 4 -    DECLARATION OF BRAD KALBAUGH IN SUPPORT OF DEFENDANTS'
            RESPONSE TO MOTION ON JURISDICTION
            JS/lf1/Gibson 1580 PLD Decl of Kalbaugh iso Defs Rsp to Mtn on Jdx

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

Exhibit 10, pg. 4 of 5

26.    On August 14, 2020, I answered Mr. Lee's question with the following email:

That is my understanding.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED January __29__, 2021.


/s/ BRAD KALBAUGH
BRAD KALBAUGH

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4791

Exhibit 10, pg. 5 of 5